988

(268 P.3d 1218)
No. 103,234

STATE OF KANSAS, *Appellee*, v. ROBERT E. GREY, *Appellant*.

Opinion filed January 20, 2012.

*Lydia Krebs*, of Kansas Appellate Defender Office, for appellant.

*Nicole Romine*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, P.J., HILL and LEBEN, JJ.

HILL, J.: Robert E. Grey appeals his 2009 rape conviction, for a crime committed in 1997, and raises, among other issues, prosecutorial misconduct as a reason to reverse. The record discloses three instances of misconduct by the prosecutor. First, prior to trial, the State failed to disclose to Grey any additions made to previously disclosed expert reports despite being required by law to do so. Second, having consistently represented to the court and

defense counsel that the victim could not identify Grey as her rapist, the State failed to notify the court and the defense that the victim could indeed identify him, once the State was informed of the change. Third, the prosecutor here made comments in closing argument that are not supported by the evidence. Considering all of these actions together, we hold such misconduct to be gross and flagrant and it deprived Grey of a fair trial. We reverse and remand for a new trial.

*The victim is picked up in a dormitory parking lot.*

While attending the University of Kansas, L.S. was living at Naismith Hall in Lawrence in May 1997. After watching a 9 p.m. movie, L.S. and her boyfriend drove back to the dormitory in separate cars. When L.S. entered the parking lot, she circled around to be closer to the door of the dorm. As she got out of her car, a man with a gun approached and told her to get back in her car. The man entered the driver's side of L.S.'s car and backed out of the parking lot.

L.S. testified later that when the man got in her car, she got a good look at him. L.S. described him as a Caucasian with dark hair and facial hair. L.S. said the man had a "dirty" odor and a scar on his right cheek. The man told L.S. to place her head between her knees, and L.S. complied. The man then drove to the Lawrence High School parking lot and told L.S. to get out. L.S. was then raped in a dark area near the school.

L.S. and the man returned to the car, and the man resumed driving. At some point, he got out of L.S.'s car and walked away, telling L.S. she should drive in the opposite direction. L.S. locked her doors and drove back to the dorm—where her boyfriend was, along with law enforcement officers. L.S. was taken to the hospital, where a sexual assault examination was performed. The officers recovered fingerprint evidence from the driver's side door of L.S.'s car. Later, L.S. helped create a composite picture of her rapist.

Almost 10 years later, in August 2007, the police received information from the Kansas Bureau of Investigation indicating one of the fingerprints found on the car matched the fingerprints of a person named Robert Edward Grey. Officers then secured a search

warrant and collected a DNA sample from Grey. The police then contacted L.S. and told her the man who committed the rape had been found. The officer told L.S. that a fingerprint found on her car matched the fingerprint of Grey, who had been picked up on another charge.

*What occurred before and during the trial is critical here.*

The State charged Grey with the rape of L.S. in violation of K.S.A. 21-3502(a)(1)(A).

Prior to the trial in the case, defense counsel was under the impression that L.S. was unable to identify her rapist. At a motion hearing held on October 10, 2008, defense counsel noted the only evidence against Grey was DNA evidence and there had been "no identification" in the case. At a status conference held on April 24, 2009, the court considered defense counsel's motion to dismiss the case due to the passage of time. Defense counsel stated that the case was "going to boil down to a victim that can't identify the perpetrator." Prior to the preliminary hearing, defense counsel informed the court that L.S. had been shown a photograph of Grey but her understanding was that L.S. did not recognize Grey. The State responded that *"there was never identification"* and it did not *"anticipate there will ever be any kind of identification in Court on this matter."* (Emphasis added.)

So informed, in her opening argument at trial, defense counsel claimed L.S. had never identified Grey as her rapist. Nevertheless, when the State asked L.S. on direct examination whether she had ever seen Grey before, she responded that she had seen him on the night of rape and then later at the preliminary hearing. L.S. explained that when the law enforcement officer called to tell her the police had found the person that had raped her, the detective told her a fingerprint taken off her car matched those of the suspect. L.S. said that prior to the preliminary hearing, she and the prosecutor looked at Grey's mug shot. L.S. said she recognized Grey just from the picture. However, L.S. did not identify Grey as her rapist at the preliminary hearing because she was not asked to identify him. L.S. said she did not tell the prosecutor that she could identify Grey because it never "came up," and the first time she

told the prosecutor she could identify Grey was "[y]esterday" (*i.e.*, the first day of trial).

After L.S.'s testimony, defense counsel moved for a mistrial. Defense counsel argued the State never gave her any indication that L.S. could identify Grey. Defense counsel explained that if the State had given her this information, she would have consulted with an identification expert and prepared her defense differently. Defense counsel noted that she had been operating "all along" on the assumption that L.S. could not identify her rapist and her opening statement was based upon this assumption. Defense counsel argued the State knew about L.S.'s ability to identify Grey the day before but allowed defense counsel to base her opening statement on evidence the prosecutor knew to be different than the evidence previously presented to defense counsel.

The prosecutor responded that the day before, over the lunch break and during voir dire, L.S. first told her she could identify Grey. The prosecutor said she had "no idea" that L.S. could identify Grey. The prosecutor indicated that she had no recollection of L.S. telling her she could identify Grey through the mug shot and she had no information about identification at the point of the preliminary hearing. The prosecutor explained that she only showed L.S. the mug shot because L.S. wanted to see what Grey looked like before she saw him in the courtroom.

The court denied the motion for mistrial.

The State then presented testimony that fingerprint evidence found on L.S.'s car matched the fingerprints of Grey. The State also presented evidence that DNA extracted from L.S.'s underwear matched Grey's DNA. The State also presented the testimony of Dr. Carol Moddrell. She was the medical director of the laboratory that reviewed the evidence in the case. Dr. Moddrell testified that sperm were found on the slides made from swabs taken during L.S.'s physical examination. Dr. Moddrell explained that when she sees a lot of sperm on a slide, it means that sexual intercourse occurred not long before the specimen was collected. Dr. Moddrell testified that when she looked at L.S.'s slide, there were sperm "everywhere." Dr. Moddrell testified that this told her the speci-

men was collected shortly after intercourse occurred—probably within a few hours as opposed to days or weeks.

Dr. Moddrell's testimony was significant in light of Grey's trial testimony. Grey testified that when he saw L.S. at the preliminary hearing, he immediately recognized her as a person with whom he had had a "situation" at a bar called the Cadillac Ranch. Grey claimed that he and L.S. had sex in the parking lot of the Cadillac Ranch and that he did not use a condom. Grey claimed that afterwards, while he was standing next to L.S.'s car, a man who was obviously upset approached L.S. and Grey. Grey indicated that this incident occurred the night before L.S.'s rape. Grey also testified he had had sex with L.S. on a prior occasion.

After Dr. Moddrell's testimony, defense counsel again moved for a mistrial, arguing Dr. Moddrell testified about evidence not provided to defense counsel and also contending Dr. Moddrell was not qualified to give some of the opinions she presented. One of defense counsel's specific complaints was that Dr. Moddrell's report simply stated sperm was found on L.S.'s slides—and did not mention anything about the "quantity" of sperm found, nor was there any opinion in the report about the time of any intercourse.

The court denied this motion for a mistrial. The jury found Grey guilty.

*We look first at the issue of misconduct of the prosecutor.*

Grey points to three separate instances of prosecutorial misconduct that he contends deprived him of a fair trial. We are persuaded that Grey was denied a fair trial and reverse his conviction. First, we set forth the standard of review and legal principles that apply when reviewing a claim of prosecutorial misconduct. Next, we examine each allegation of misconduct and any effect it may have had on the trial in this case.

For statements made by prosecutors, our Supreme Court has outlined a two-step analysis for prosecutorial misconduct claims in *State v. McCaslin*, 291 Kan. 697, 715, 245 P.3d 1030 (2011). First, the appellate court must determine whether the prosecutor's statements were outside the wide latitude permitted in discussing the evidence. Second, the appellate court must decide whether the

comments constitute plain error—(*i.e.*, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial such that reversal is required). This test has been applied to prosecutorial action in contexts beyond mere comment on the evidence. 291 Kan. at 715.

The court has also given specific guidance regarding the second step of this analysis—which concerns whether a new trial should be granted on the basis of prosecutorial misconduct:

" 'In the second step of the two-step prosecutorial misconduct analysis, the appellate court considers three factors to determine whether a new trial should be granted: (1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. None of these three factors is individually controlling. Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 (inconsistent with substantial justice) and *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (conclusion beyond reasonable doubt that the error had little, if any, likelihood of having changed the results of the trial), have been met.' [Citation omitted.]" 291 Kan. at 715-16.

We will now look more closely at the prosecutor's conduct during this trial.

*The law requires disclosure of additional reports.*

Grey claims that prior to trial, he requested the precise lab results of any physical examination of L.S. that was made or *yet to be made*. Grey says the State responded by giving him Dr. Moddrell's report, which indicated sperm was present in L.S.'s vaginal sample. Grey claims the prosecutor then contacted Dr. Moddrell 1 week prior to trial and told her the *quantity* of sperm present would be an "issue" at trial. Grey says Dr. Moddrell therefore reexamined the evidence and testified at trial that sperm was present and—based on the number of sperm present—Grey must have had sex with L.S. within hours of her physical examination. Grey argues the prosecutor's failure to inform defense counsel of Dr. Moddrell's new examination of the evidence and resulting opinion was misconduct because Dr. Moddrell's original report said noth-

ing about the quantity of sperm found. Also, the report did not contain her opinion that the time of the intercourse was within hours. Dr. Moddrell's testimony is indeed significant because Grey's defense at trial was that he had consensual sex with L.S. the night before the rape.

Notably, the facts as alleged by Grey are not disputed by the State. The State admits that Dr. Moddrell's report made no reference to the quantity of sperm found on the examination slides. Nor does the report contain her opinion about the time of intercourse. The State also admits that the prosecutor spoke to Dr. Moddrell 1 week prior to trial about the issue, Dr. Moddrell reexamined the slides to determine the amount of sperm present, and Dr. Moddrell testified to the quantity of sperm found and provided an opinion based on this fact. The State simply responds that Dr. Moddrell's report was in the possession of the defense and was unchanged, Dr. Moddrell was available for questioning, and Dr. Moddrell's testimony was also presented through the testimony of another witness.

After being ordered to disclose information, a prosecutor is required by law to furnish any additional material to the defense. K.S.A. 22-3212(g) requires such disclosure before or even during trial:

If, subsequent to compliance with an order issued pursuant to this section, and prior to or during trial, a party discovers additional material previously requested or ordered which is subject to discovery or inspection under this section, the party shall promptly notify the other party or the party's attorney or the court of the existence of the additional material. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this section or with an order issued pursuant to this section, the court may order such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems just under the circumstances.

Clearly, under this law the prosecutor was obliged to promptly notify Grey of the results of the additional testing the State had requested. We consider this breach of the law to be misconduct.

When the defense objected, the district court turned a blind eye to this statutory breach of duty by the prosecution and shifted dis-

covery responsibility to the defense by ruling: "It is incumbent on the defense to review the discovery provided by the state to find out how it plays into their theory of the defense." The court explained that if the defense intended to pursue a defense of consent, it could have explored Dr. Moddrell's report and interviewed her. Evidently, in the district court's view, defense counsel must sense somehow that the prosecutor may ask for additional testing just 1 week prior to trial and, therefore, interview the State's experts to guard against situations such as this and not rely on the law compelling the prosecutor to forward new information and any change in expert opinions to the defense.

Unlike the district court, our Supreme Court has not turned a blind eye to such misconduct. In *State v. Lewis*, 238 Kan. 94, 708 P.2d 196 (1985), the Supreme Court reversed Lewis' convictions. In *Lewis*, the facts reveal that when law enforcement officers apprehended the defendants and searched the car belonging to one of them, a knife was discovered. In response to defense counsel's motion for discovery and inspection, the State provided a lab report indicating the knife contained no blood evidence. At trial, defense counsel stated in opening argument that the State's expert would testify there was no blood found on the knife. But before testifying, the expert advised the State that its report was wrong and the expert had found blood on the knife. The prosecutor did not inform the judge or defense counsel of this fact and elicited testimony from the expert indicating blood was found on the knife. When defense counsel requested a mistrial on this basis, the court instead ruled to strike the evidence and gave a limiting instruction to the jury that it was to disregard testimony regarding blood on the knife.

The Supreme Court explained that the prosecutor's breach of duty was a failure to perform a duty imposed by the legislature— as a prosecutor is required to permit a defendant to inspect and copy the results of scientific tests or experiments made in connection with a case that are known to the prosecuting attorney. 238 Kan. at 98. The *Lewis* court noted the defense based its strategy in part on the belief that the expert would testify there was no blood on the knife, and defense counsel had emphasized this fact during opening statement. The court reasoned that after opening

statements were made, the State used the corrected information to defeat the defense theory and this sort of disclosure "could hardly go unnoticed by the jury." 238 Kan. at 99.

The court stated:

"Prosecutorial misconduct occurs when the county attorney fails to disclose to both the trial judge and the defense counsel that he intends to introduce into evidence a report which he failed to inform the defense counsel had been corrected. If the corrected statement changes the theory of defense as presented to the jury in opening statement, then neither admonition nor instructions by the trial judge can cure the resulting prejudice." 238 Kan. at 99.

The next reported instance when this trial-by-ambush tactic was reviewed by an appellate court came in *State v. Campbell*, 29 Kan. App. 2d 50, 23 P.3d 176 (2001). In *Campbell*, the defendant was convicted of the unintentional second-degree murder of her child. One of the key issues at trial involved the child's time of death. Prior to trial, the prosecutor represented to the district court and defense counsel that the State had no evidence regarding the time of death; the defense therefore approached the case with the belief that no such evidence existed. Nevertheless, at trial, a witness for the State gave testimony regarding the time of death that undermined the theory of defense.

Our court reversed the defendant's convictions on the basis of prosecutorial misconduct. 29 Kan. App. 2d at 62. The court first determined that the prosecutor had information concerning the time of the death approximately 7 months prior to trial yet failed to disclose this information to defense counsel. The court found the prosecutor deliberately lied to defense counsel and the court by denying she had any time of death evidence. 29 Kan. App. 2d at 58. The court, after calling the conduct of the prosecutor outrageous, stated:

"We hold that a prosecutor is guilty of serious misconduct when he or she leads a defendant to believe that there is no evidence, expert or otherwise, written or oral, on a particular fact in controversy when, at the time of such representation, the prosecutor does have evidence on such fact whether in written form or otherwise and such evidence is offered and admitted at the time of the trial." 29 Kan. App. 2d at 61.

Thus, it is undeniable that a breach of these rules of disclosure by the prosecutor must never be taken lightly if we are to have fair trials.

Turning to the facts of this case, we find a similar pattern of the State having superior knowledge of expert evidence and failing to disclose the information to the defense, even though it was required by law to do so. Here, a week before the trial the State sought and obtained expert information about the time of intercourse and failed to disclose this new opinion to the defense. While we find no evidence of deliberate lying as was found in *Campbell*, an ambush similar to the one created in *Campbell* arose here due to the deliberate actions of the prosecutor.

Clearly, the failure to disclose this new information from the expert to the defense was prejudicial to Grey. Grey's line of defense centered on his claim that he had engaged in consensual sexual intercourse with L.S. the night before the rape and he had not used a condom. If believed, this would account for the presence of his DNA in her body. Therefore, Dr. Moddrell's conclusion that the specimen collected from L.S. after the rape was collected within a few hours of intercourse was devastating to the defense. In his brief, Grey submits:

"[I]f defense counsel in the present case had been able to prepare for Moddrell's testimony that the number of sperm present on the slide indicated the sexual intercourse occurred within hours of L.S.' exam, the result of the trial may have been different. At the very least, defense counsel could have consulted with her own expert witness regarding the relationship between the number of sperm present and the length of time since sexual intercourse occurred."

Furthermore, we reject any assertion that simply forwarding a written report that does not contain the new material to the defense would somehow comply with the discovery statutes. The parties have a continuing obligation to update discovery in a meaningful way. Obviously here, the State asked the expert to examine the samples with the purpose of giving an opinion about the time of intercourse, a subject not mentioned in the expert's report. There was no way for the defense to divine this information from Dr. Moddrell's report.

Finally, we are not persuaded that the admission of Sindey Schueler's testimony makes this misconduct harmless error. Schueler, a biology supervisor for the KBI, testified at trial about the DNA samples. During her testimony, Schueler offered an opinion, without elaboration, that the collection of the samples happened within a short time of intercourse. In response, we note that it was Dr. Moddrell's testimony that the jury requested to be read back. The details about the theory of the timing of the intercourse came from Dr. Moddrell's testimony, not Schueler's. We do not see Schueler's opinion excusing the deliberate withholding of Dr. Moddrell's new opinion from the defense.

Considering the prejudicial effect of the conduct of the prosecutor here, we conclude the misconduct was gross and flagrant. This additional testing was done at the State's request. Additional findings and conclusions were made and they were not in the written report previously disclosed to the defense. The prosecutor ignored the legal obligation to update the reports and used the new information to undercut the defense. In *Campbell*, the court noted that if defense counsel had been able to prepare for the time of death evidence offered by the State, the result of the trial may have been different. 29 Kan. App. 2d at 62. Here, if defense counsel had known of Dr. Moddrell's new findings and conclusions, the outcome of the trial might have been different. For this reason alone we must reverse, but there are additional concerns we must address.

*The prosecutor failed to disclose the fact that the victim could identify Grey.*

Grey argues that his defense counsel, particularly in opening statement, relied upon the prosecutor's representation that L.S. had not identified Grey as her rapist. Then, without warning to the defense and after the defense's opening statement, the victim identified the defendant as her rapist at trial. The prosecutor became aware after the trial started that the victim could indeed identify the defendant but never disclosed that fact to the defendant. Under the facts of this case, we think the prosecutor had a duty to disclose to the defense that the victim could now identify the defendant

because the State had consistently represented that the victim could not identify the defendant. If a prosecutor becomes aware that the State's prior position communicated to the defendant has become false, the prosecutor must disclose to the defendant within a reasonable time the fact that the opposite is now true.

Like the prosecutor in *Lewis*, the prosecutor in this case did not discover the change in the evidence until after the trial had begun. When the prosecutor early on represented that she had no identification evidence from the victim, she actually had no such evidence. Only later, when she gained such evidence did she fail to disclose it. We find this conduct less egregious than the prosecutor's failure to update the expert's opinions to the defense, but it is still troubling because it misrepresents the truth.

The prosecutor in this case had a position superior to the defense in two ways. First, the prosecutor knew the defense was relying upon the State's representation that the victim could not identify the defendant as the rapist. Second, the victim had told the prosecutor she could identify the victim and had in fact recognized him as early as the preliminary hearing, held well before the trial. The State's silence about the change of fact had a devastating effect upon the defense.

It has long been recognized since the United States Supreme Court's ruling in *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 215 (1963), that a defendant has a constitutional privilege to request and obtain from the prosecution evidence that is material to the guilt or innocence of the defendant. Suppression of such evidence is a violation of the defendant's Fourteenth Amendment due process rights. Obviously, the ability of the victim to identify the defendant as her rapist is material to the guilt or innocence of the defendant and, thus, it is evidence that can be obtained by the defendant in discovery.

Along the same line, the prosecution has a court-recognized affirmative duty, independent of court order, to disclose *exculpatory* evidence to a defendant. See *State v. Carmichael*, 240 Kan. 149, 152, 727 P.2d 918 (1986). But what is the obligation, if any, to disclose *inculpatory* evidence? In *State v. McIntyre*, 259 Kan. 488, 496, 912 P.2d 156 (1996), our Supreme Court has said that in

Kansas there is no independent duty to affirmatively disclose inculpatory evidence. That was the ruling in a case where the defendant had made no request for any discovery. The State had failed to disclose evidence of a second photo line-up where a witness identified the defendant as the shooter. Prior to that line-up, the witness could not identify the defendant to the police. The *McIntyre* court held that failure to disclose the existence of the line-up was not a denial of fundamental fairness because the defendant had made no attempt to interview the witness, nor did the defendant request disclosure of any inculpatory evidence. 259 Kan. at 497. In other words, the failure to disclose had no prejudicial effect on the defense. The instant case differs. We believe fundamental fairness called for the prosecutor in this case to disclose the fact that the victim could identify the defendant as the rapist because the State had maintained consistently right up to the start of the trial that she could not.

We probe deeper. In *Lewis*, the State told the defense that it had no evidence of blood on the knife, but after the trial started it found out that the expert had in fact discovered evidence of blood on the knife and did not disclose that change to the defense. In *Lewis*, the Supreme Court ruled it was misconduct not to disclose this change of evidence. Indeed, the court held: "[T]he State's introduction of evidence, of which the defendants' counsel were unaware and *which destroyed the defense strategy*, is such an event requiring a mistrial." 238 Kan. at 97.

We consider this to be a question of timing and effect on the defense. The identification evidence is what it is, incriminating evidence. But the State's silence about the change of evidence from its prior representation that there was no such evidence until after the trial started served to mislead the defense. This cannot be ignored, especially when the defense had made the bold statement during the opening that there is no identification evidence. In *Lewis*, the incriminating evidence was blood on the knife but the timing of the disclosure of its existence until after the trial started created the prejudice to the defense, especially in light of the State maintaining it had no such evidence. We agree with the reasoning in *Lewis* that when the damaging effect of misconduct cannot be

removed by admonition and instruction, justice requires a mistral. At this point, we can only call for a new trial.

Just as in *Lewis*, the prosecutor failed to disclose to defense counsel that she gained identification evidence on the first day of trial—and she intended to introduce the evidence. Had defense counsel known of this evidence, she undoubtedly would have changed her opening argument. By arguing L.S. had never identified Grey, defense counsel and Grey most certainly lost credibility with the jury when the State later had the victim identify Grey. If this information came as a surprise to the prosecutor, it was most certainly a surprise to Grey, and the State knew that. The prosecutor kept quiet about the change until the new information could be used to the greatest benefit to the State's case.

The prejudicial effect of the failure to disclose this new information is tempered somewhat by how the prosecutor said she learned of the change in the evidence. We find no evidence in the record that the State's attorney had learned of this sometime prior to the trial, so there is no evidence of lying as in *Campbell*. Certainly, if informed promptly by the State, defense counsel could have amended her opening remarks to the jury or asked for a continuance or additional resources and time to prepare to now deal with identification testimony. But, like the blood on the knife evidence in *Lewis*, the fact that defense counsel said the victim could not identify Grey and then the victim promptly identified Grey could hardly go unnoticed by the jury.

It is the duty of the prosecutor in a criminal matter to see that the State's case is properly presented with earnestness and vigor and to use every legitimate means to bring about a just conviction, but the prosecutor should always bear in mind that he or she is an officer of the court and, as such, occupies a quasi-judicial position whose sanctions and traditions he or she should preserve. *State v. Lockhart*, 24 Kan. App. 2d 488, 493, 947 P.2d 461, *rev. denied* 263 Kan. 889 (1997). Indeed, in *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 (2000), our Supreme Court, quoting the United States Supreme Court, stated that "the prosecutor represents 'a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a

criminal prosecution is not that it shall win a case, but that justice shall be done' " (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 [1935]). To ensure a fair trial here, the prosecutor should have informed defense counsel that the victim could in fact identify Grey as the rapist and the State's prior representation to the contrary was false.

Based on the Supreme Court's reasoning in *Lewis*, the prosecutor in this case engaged in misconduct when she failed to inform defense counsel prior to opening statement that an identification had been made by the victim and the State intended to elicit this evidence at trial. As in *Lewis*, the prosecutor failed to disclose to defense counsel evidence that was gained just prior to opening statement—and that would have changed the defense theory as presented to the jury.

We do not say there is a duty for the State to disclose inculpatory evidence. But we do say that when the State has maintained to the court and defense counsel that it does not have certain evidence, fundamental fairness calls for the State to inform the court and counsel that it now has such evidence. This is especially true when the defense has been structured on the State's representation that such evidence does not exist. Under the circumstances in this case, failure to disclose the change amounted to a deception that created a great prejudice to the defense.

*One of the prosecutor's closing comments exceeded the limits afforded counsel.*

Grey next complains about three comments the prosecutor made in closing argument. Grey first claims the prosecutor commented on a fact not in evidence when she indicated Grey claimed Joseph Tolchiner (L.S.'s boyfriend at the time) drove a black car—when Grey actually testified he did not know the color of Tolchiner's car. Second, Grey argues the prosecutor appealed to the passions and prejudices of the jury by commenting on a picture of L.S. and Tolchiner taken the day of the rape—arguing they looked like a "happy" couple and L.S. did not look like a woman who had picked up a guy the previous night. Finally, Grey argues the prosecutor incorrectly defined and diluted the State's burden of proof

by telling the jury that if it believed L.S.'s testimony, it "vaulted" itself over the "fence" of reasonable doubt. Only the first comment crossed the line of fair comment.

We deal first with the prosecutor's comment on a fact not in evidence. At trial, Grey testified he and L.S. had sex in the parking lot of the Cadillac Ranch the night before the rape. He claimed that afterwards, a man who was obviously upset approached him and L.S. Grey said he felt this was probably L.S.'s boyfriend. Grey described the man as fairly tall and athletically built with sandy-colored hair and fair skin. When asked whether he recalled the color of the man's car, Grey said, "I don't."

In closing argument, the prosecutor explained to the jury that because Grey testified in the case, the jury would get to judge his credibility. The prosecutor went on to discuss Grey's "story" of how he met L.S. With regard to Grey's testimony regarding Tolchiner, the prosecutor stated:

> "He says oh, I remember the boyfriend, he was six-three, he had pale skin, kind of pale skin, sandy blonde hair and then when he came into court I recognized him too from twelve years later showing up in the parking lot. Oh, and I also remember that he drove a black car. I don't know about you ladies and gentlemen, I was waiting to hear it was a BMW, there was so much details coming in about what happened 12 years ago."

There is no evidence in the record that Grey described Tolchiner's car as being black. Here, the prosecutor clearly commented on evidence not in the record when she indicated that Grey said Tolchiner drove a black car. This rhetorical technique of adding words to Grey's statement served to make him appear less believable to the jury. Exaggerating his statement by adding details to what he said served as a basis for the prosecutor's argument that Grey was lying. The trouble is, Grey did not make the statement, only the prosecutor did.

It is well established that a prosecutor must confine his or her comments in closing argument to matters in evidence. When the prosecutor argues facts that are not in evidence, the prosecutor engages in misconduct and the first prong of the test for prosecutorial misconduct has been met. *State v. Murray*, 285 Kan. 503, 512, 174 P.3d 407 (2008).

We next consider the prosecutor's comment regarding the picture of L.S. and Tolchiner. We do not find it out of bounds. Grey testified that he and L.S. had sex in the parking lot of the Cadillac Ranch the night before the rape of L.S. In closing argument, the prosecutor told the jury to remember L.S.'s testimony and demeanor on the stand when considering Grey's claim. The prosecutor stated:

"And right here, this picture taken that very day before they went to Kansas City, this couple, this happy couple, this happy attractive couple. Does that look like a woman that would have been out the night before picking somebody up in a bar?"

Grey argues the prosecutor's comment appealed to the jury's emotions because it made the jurors believe L.S. was happy before the rape and appealed to the jury's prejudices by suggesting L.S. was not the type of person who would engage in casual sex.

In *State v. Davis*, 275 Kan. 107, 121, 61 P.3d 701 (2003), the court stated:

"It is improper for a prosecutor to accuse a defendant of lying. Such an accusation has been recognized by this court as going beyond the wide latitude afforded prosecutors in closing argument. This court continues to recognize as proper, however, the freedom of the prosecutor to craft an argument that includes reasonable inferences based on the evidence and that when a case turns on which of two conflicting stories is true, certain testimony is not believable. The ultimate conclusion as to a witness' veracity remains solely with the jury."

By commenting on L.S.'s demeanor at trial and pointing to a picture of the "happy couple" taken the day of the rape, the prosecutor in this case merely asked the jury to believe L.S.'s testimony and reject Grey's version of the events. The prosecutor simply asked the jury to make an inference from a picture properly admitted at trial. The prosecutor's comments on this point were permissible and do not constitute misconduct.

We finally consider the prosecutor's comments about reasonable doubt. Again, we do not find the following comments excessive. In closing argument, the prosecutor stated:

"And if you believe [L.S.] and her testimony, specifically, that the man who raped her ejaculated, specifically, that she did not know Robert Grey, had never seen him before. If you believe that then you have vaulted yourself. You're sailing over that fence of beyond a reasonable doubt. If you believe [L.S.] you are there.

That's it. The incident at Cadillac Ranch did not happen a [*sic*] according to [L.S.]. She did not know this man or have sex with him. So, you are over that fence. That's how simple it is if you believe her. The case is proven beyond a reasonable doubt. Because we know from the DNA that, that DNA in her, is the defendant's. We know that."

Grey argues those comments impermissibly diluted the State's burden of proof by causing the jury to think that as long as it believed L.S.'s testimony, the State had automatically met its burden of proof. What Grey fails to acknowledge is that the State did not simply comment on L.S.'s testimony, it also commented on the DNA evidence. Here, if the jury accepted the DNA evidence *and* believed L.S.'s testimony, the jury *could have concluded* the State *had met* its burden of proving Grey guilty.

Grey was charged with the rape of L.S. in violation of K.S.A. 21-3502(a)(1)(A)—which defines rape as sexual intercourse with a person who does not consent to the sexual intercourse when the victim is overcome by force or fear. At trial, L.S. testified that when she was first accosted by her attacker, she must have had a look of fear and helplessness on her face and that she remembered mouthing "help." L.S. testified that her attacker penetrated her vagina with his penis against her will. DNA evidence demonstrated that Grey's sperm was detected in L.S.'s vagina. If the jury accepted this evidence as true, the State met its burden of proving Grey raped L.S. The State's comments to this effect were therefore not misconduct.

In *State v. Magallanez*, 290 Kan. 906, 912, 914-15, 235 P.3d 460 (2010), the case cited by Grey on appeal, the court held it was prosecutorial misconduct for the prosecutor to tell the jury that if it believed the defendant was guilty, the reasonable doubt standard was met. Arguing that the State's burden is met when the jury simply believes a defendant is guilty is not the same as arguing the burden is met if the jury finds a particular witness' testimony and the State's physical evidence believable. *Magallanez* is inapplicable here.

To summarize, we find only the comment about the car to be out of bounds. If this was the only instance of misconduct, we would not reverse. But when we consider the comment along with

the misconduct concerning the withholding of the expert's new opinion and the failure to disclose the victim's ability to identify the defendant, we cannot discount the deleterious impact of this comment. The error helps to convince us Grey did not receive a fair trial.

*Grey effectively withdrew his objection to the pretrial identification; therefore, he cannot claim error by the trial court for not granting his motion to suppress that identification.*

Grey asked the court to suppress L.S.'s pretrial identification of him because it was the result of "an unduly suggestive one-man 'show-up' " and tainted any later identification of Grey. We think this objection was withdrawn and thus cannot serve as a reason for reversal.

At the close of the State's case, defense counsel clarified her position on the in-court identification of Grey. Defense counsel stated:

"I know that you denied my motion for mistrial. There was discussion about potentially striking [L.S.]'s testimony or not. I don't think that I moved to strike her testimony. My position is that if I don't get the mistrial, which I have not, that her testimony should come in that there should be the eyewitness instruction given at the time. But I have prepared my witnesses to respond to what she said in court, and I just want to make sure that there is not a ruling that her testimony is striken [sic], and I'm going to get my witnesses confused."

When defense counsel withdraws his or her objection to the admission of evidence subject to a prior motion to suppress, he or she cannot challenge the district court's denial of the motion to suppress on appeal. See *State v. Bishop*, 264 Kan. 717, 719-20, 957 P.2d 369 (1998). Likewise, when a party by his or her own actions invites the court into error, that party cannot complain about the error on appeal. *State v. Oliver*, 30 Kan. App. 2d 665, 667, 46 P.3d 36 (2002).

By stating she preferred that L.S.'s testimony "come in" and the jury be given an eyewitness instruction, defense counsel effectively withdrew her motion to suppress the in-court identification of Grey. Grey may not now challenge the denial of his motion to suppress the identification evidence on appeal.

*We need not rule on Dr. Moddrell's qualifications since we are ordering a new trial.*

Grey next argues the district court erred in denying his motion to strike Dr. Moddrell's testimony. If the State wishes to recall Dr. Moddrell to testify, the determination of her expertise must be made in that trial and not in this appeal.

To sum up, we stress that the prosecutor engaged in three instances of misconduct: (1) She failed to notify defense counsel when she obtained evidence from Dr. Moddrell that was not contained in Dr. Moddrell's original report, (2) she became aware that L.S. could identify Grey as her rapist but failed to inform defense counsel of this information, and (3) she argued a fact not in evidence during closing argument. Viewing these instances of misconduct together, we conclude the prosecutor's conduct in this case was gross and flagrant. In the second step of this analysis, we must follow the directives of our Supreme Court and determine if this is harmless error. We cannot say in this case beyond a reasonable doubt that the misconduct of the prosecutor did not affect the substantial rights of Grey and the results of the trial in light of the entire record. See *State v. Ward*, 292 Kan. 541, Syl. ¶¶ 5-6, 256 P.3d 801 (2011). Grey did not receive a fair trial because of the actions of the prosecutor.

We reverse the conviction and remand for a new trial.