NOT DESIGNATED FOR PUBLICATION

No. 112,657

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ROBERT E. GREY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Douglas District Court; MICHAEL J. MALONE, judge. Opinion filed March 25, 2016. Affirmed.

*Debra J. Wilson*, of Capital Appeals and Conflicts Office, for appellant.

*Mark Simpson*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before PIERRON, P.J., BRUNS and GARDNER, JJ.

*Per Curiam*:  In 1997, L.L. was attacked and raped by a stranger. Ten years later, fingerprints lifted from her car were matched to Robert Grey. Police obtained a search warrant for Grey's DNA, and it matched DNA left behind by L.L.'s assailant. A jury convicted Grey of rape, and the district court sentenced him to 300 months' imprisonment. Grey appeals, raising two evidentiary errors and challenging one of our Kansas discovery statutes.

This case is the direct appeal from Grey's second trial for the rape of L.L. After a jury found him guilty in 2008, Grey appealed. This court reversed his conviction and

remanded his case for a new trial. See *State v. Grey*, 46 Kan. App. 2d 988, 268 P.3d 1218 (2012). The facts as developed at his second trial follow.

In May 1997, L.L. and her boyfriend returned to college in Lawrence after spending the evening out of town. Because they had transported some of L.L.'s belongings to a friend's home, they drove separately. When L.L. exited her car at her residence hall, a man with a gun appeared and forced her into the passenger seat. The man drove L.L. to an empty parking lot near the high school. He forced L.L. out of the car and into a secluded area. He instructed L.L. to remove her pants and kneel down on the ground. He penetrated her digitally with a gloved hand before demanding she turn over onto her back. He then pulled her shirt over her head and raped her until he ejaculated. Afterward, he and L.L. returned to the car. He drove a short distance, parked, and left her alone in the vehicle. The man wore a mask for part of the attack; L.L. described him as slender, white, about her height, with dark hair and a mustache.

L.L.'s boyfriend spotted L.L.'s car driving away while she sat "kind of huddled" in the passenger seat. He called the police. He described the driver as a white man with a goatee who looked to be about 25 years old and about 6 feet tall.

L.L. told the investigating officer her assailant appeared to be between 5-foot-7 and 5-foot-9 with a full beard and mustache. She estimated his age at around 30 years old. A few days after the assault, she assisted the police department in completing a composite sketch of her attacker. At that time, she described her assailant in much the same way: a white male in his mid-to-late twenties with a slender build, dark hair, a mustache, and facial hair.

L.L. submitted to a sexual assault examination, where medical professionals collected evidence from her body, including her assailant's DNA. Officers also processed L.L.'s car for evidence, collecting latent finger and palm prints. A technician at the

2

Kansas Bureau of Investigation (KBI) searched unsuccessfully for matches to the unknown fingerprints. However, after the KBI's database was updated in 2007, the system returned a match on one of the unidentified prints from L.L.'s car. The fingerprint belonged to Grey.

Based in part on the fingerprint match, police received a search warrant for Grey's DNA. Grey's DNA was a "very, very strong match" to L.L.'s assailant, and the State charged Grey with rape. At trial, Grey claimed that the night before the alleged rape, he and L.L., who was a stranger to him, met at a local bar and engaged in unprotected consensual sex in the front seat of his car. According to Grey, a very angry man, possibly L.L.'s boyfriend, drove up to him and L.L. after their sexual encounter. Grey and the man exchanged words before the man drove off. Grey also testified that, in May 1997, his employer required facial hair be limited to a "neatly trimmed" mustache.

Important to Grey's defense was testimony about the motility, or movement, of the sperm collected from L.L. Specifically, a medical technologist testified that the sperm was nonmotile, and Grey's expert witness, Dr. Merle Hodges, explained that this lack of motility indicated that the sperm had likely been in L.L.'s vagina for no less than 4 hours and possibly as long as 12 hours, a much longer period than the 3 hours between her assault and the exam. Hodges also testified regarding the lack of trauma to L.L.'s genitals. However, the State called rebuttal witnesses, including Dr. Michael Weaver, to contradict Hodges' testimony concerning the sperm motility.

The jury returned a guilty verdict. Prior to sentencing, Grey filed a motion for a new trial alleging various due process violations. The district court denied the motion and sentenced Grey to 300 months' imprisonment. Grey timely appealed.

Grey first argues the district court erred by not suppressing the DNA evidence. He contends the affidavit supporting the search warrant contained material omissions and

3

impermissible conclusory statements, rendering it inadequate. In order to better understand these arguments, however, a more detailed examination of the affidavit and the hearing on Grey's motion to suppress is required.

Prior to trial, Grey moved to suppress the DNA evidence against him. Grey contends the affidavit in support of the search warrant contained blanket assertions, unsupported inferences, and material omissions. Among other things, the affidavit provided the following information:

- L.L. described her attacker as a white male between 5-foot-7 and 5-foot-9 with a "thin build, dark brown matted hair . . . with a beard and mustache."
- Of the fingerprints collected from L.L.'s car, four were entered into the KBI's database but returned no matches; two remained in the unidentified fingerprint file.
- Almost 10 years after L.L.'s attack, the two unidentified prints were matched to Grey's fingerprints.
- Detective John Hanson, the affiant, compared the composite sketch of L.L.'s attacker to "several drivers' license photos" and noticed "a significant resemblance in a 2004 photo of Grey."
- Grey's biographical information matched L.L.'s description of her attacker.

Grey argued the affidavit left out vital information about the fingerprint evidence, including their location and the fact that the two unidentified prints were actually the same print. He also reasoned that the alleged resemblance between his photographs, the composite sketch, and L.L.'s description constituted a "completely subjective inference" by Detective Hanson.

4

At a hearing on the motion to suppress, KBI fingerprint technician Steve Koch testified about the fingerprints lifted from L.L.'s car. Koch testified that nothing on the fingerprint cards he received from the police indicated where the prints were located. Koch explained that the two previously unidentified fingerprints matched Grey's left little finger. He also clarified that the two fingerprints constituted the same fingerprint that the printing officer lifted twice. However, Koch admitted he did not specify this on his report, because the two separate lifts were treated as separate fingerprints.

Detective Hanson testified he relied on Koch's report about the fingerprint matches when completing the affidavit. He also explained that although he knew the detective who lifted the fingerprints had dusted both inside and outside of the car, he knew nothing about where exactly in the car the matching prints originated. Later, he learned that the matching print was somewhere on the molding on the car's exterior. However, as Detective Hanson understood it, L.L.'s attacker had been both inside and outside the car. In terms of the sketch comparison, Hanson acknowledged that he failed to attach either the sketch or driver's license photograph to his affidavit.

Ultimately, the district court denied the motion. The court determined that Hanson's assertions about the resemblance between Grey, the sketch, and the description arose from his careful review of Grey's photographs. As for the fingerprints, the district court found that the lack of clarity involving the number of fingerprints was not a deliberate or material omission.

When reviewing a motion to suppress evidence, we apply a bifurcated standard. Specifically, we determine whether the factual findings underlying the district court's decision are supported by substantial competent evidence, while the ultimate legal conclusion drawn from those factual findings are reviewed de novo. *State v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014).

5

More specific to the present case, when a defendant challenges an affidavit supporting a search warrant, the reviewing court must determine whether the issuing magistrate had a substantial basis for finding probable cause. *State v. Adams*, 294 Kan. 171, 180, 273 P.3d 718 (2012). This standard, which is inherently deferential, asks whether the affidavit provided a substantial basis to determine that there was "'a fair probability that evidence will be found in the place to be searched.'" 294 Kan. at 180.

As previously explained, Grey challenges the affidavit on two grounds. First, he maintains that the lack of clarity about the fingerprints constitutes a deliberate and material falsehood. Second, he argues that Hanson's assertions about Grey's resemblance to L.L.'s attacker are conclusory and not backed by any evidence. Each argument will be addressed in turn.

Generally, courts presume the affidavit supporting a search warrant to be valid and accurate. See *Franks v. Delaware*, 438 U.S. 154, 171, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). For that reason, the subject of the search warrant usually cannot dispute the facts contained within that affidavit. See *Adams*, 294 Kan. at 179. However, a limited exception exists when the subject alleges that the affidavit contains either deliberate falsehoods, untrue statements demonstrating a reckless disregard for the truth, or omissions. *Franks*, 438 U.S. at 171; *Adams*, 294 Kan. at 179. The challenged statements must be material, meaning "necessary to find probable cause." 294 Kan. at 179. Moreover, allegations of "negligence or innocent mistake" are insufficient. *Franks*, 438 U.S. at 171. Additionally, in the case of omissions, the missing information must render the affidavit unreliable. *State v. Schoonover*, 281 Kan. 453, 513, 133 P.3d 48 (2006). And if probable cause still exists after striking the false information and inserting the omissions, the search warrant will remain valid. See *Franks*, 438 U.S. at 171-72; *Schoonover*, 281 Kan. at 513.

6

On appeal, Grey raises one alleged falsehood and one alleged omission. In terms of the falsehood, Grey argues that Hanson either deliberately or recklessly wrote that the KBI returned two fingerprint matches when in fact, the match constituted two lifts of the same print. In his brief, Grey recognizes that Hanson simply followed Koch's report when completing the affidavit. However, he argues that Koch's knowledge about the fingerprints should have been imputed to Hanson.

Koch testified that the two fingerprint matches originated from two separate lifts of the same print. But while Grey implies that Koch either sloppily or deliberately misreported the single fingerprint as two separate matches, Koch explained that the separate lifts were treated as separate fingerprints in the KBI system. Because the two lifts were each treated individually, Koch treated them the same way in his report. Nothing in Koch's testimony suggests that he either purposely or recklessly misrepresented the lifts as two separate prints. Instead, it necessarily implies that he followed some sort of standard operating procedure and filled out his report accordingly. In other words, Koch committed no deliberate or reckless falsehood in filing his report.

Moreover, the doctrine Grey relies on—called both the collective-knowledge doctrine and fellow-officer rule—appears to be inapplicable to the present case. Under this rule, one officer's knowledge can sometimes be imputed to another, allowing that second officer to "stop, search, or arrest a suspect" despite lacking the type of firsthand knowledge ordinarily required to act. *State v. Miller*, 49 Kan. App. 2d 491, 496-97, 308 P.3d 24, *rev. denied* 298 Kan. 1206 (2013); see *State v. Clark*, 218 Kan. 726, 731-33, 544 P.2d 1372 (1976) (applying the doctrine to a warrantless arrest). On appeal, Grey cites to no cases suggesting that the collective-knowledge doctrine applies to situations involving search warrants, relying instead on cases concerning only warrantless arrests and searches.

A review of our Kansas cases indicates that the doctrine is rarely applied to the present situation. In what appears to be the one case on the subject, two officers arrived at the defendant's home to investigate a threat complaint. While there, they smelled marijuana. When asked, however, two other people at the home said they did not smell anything. This incident caused one of the officers to obtain a search warrant. He relayed the information about the marijuana smell to the investigator who prepared the affidavit without mentioning that others at the home denied smelling the same. The defendant based her challenge to the warrant on several omissions, including this one. The district court denied her motion to suppress, and she appealed. *State v. Riley*, No. 93,127, 2006 WL 90089, at *1-2 (Kan. App. 2006) (unpublished opinion).

On appeal, the State argued that because the first officer never told the affiant about the other people not smelling marijuana, the omission was not a deliberate one. The *Riley* court rejected that position and imputed the first officer's knowledge to the affiant. 2006 WL 90089, *2. Otherwise, the court reasoned, "police could omit material information by merely employing a separate officer to prepare the affidavit." 2006 WL 90089, at *2. The *Riley* court ultimately found the omission immaterial. 2006 WL 90089, at *2.

The present situation differs from *Riley* and those cases applying the collective-knowledge doctrine to stops and arrests. Here, Detective Hanson clearly acted on information from Koch, but nothing in the record suggests that he acted on directions or instructions from Koch. Instead, he simply used Koch's report to help assemble the affidavit. Moreover, as previously explained, Koch only reported the two lifts as separate fingerprints because the system treated them as individual prints. Koch's description of the two fingerprints is not a falsehood. The concern in *Riley* that officers will side-step honesty by not preparing their own affidavits is not present here. In short, under the particular facts of this case, no justification exists for imputing Koch's knowledge to Hanson.

Turning to the alleged omission, Grey contends that Hanson failed to specify the location of the fingerprints. But Hanson clearly testified that he only learned of the fingerprints' location after preparing the affidavit. He only knew that the prints originated from L.L.'s car. Moreover, Koch also lacked any information about the prints' location. Because Hanson lacked this information, it cannot fairly be said that he deliberately omitted it. See *Schoonover*, 281 Kan. at 513 (requiring that the omission be material and deliberate).

In short, Hanson did not deliberately omit or misrepresent the information about the number of fingerprints or their location. Therefore, Grey's challenge to the affidavit on these grounds fails.

Next, Grey argues that the portion of the affidavit concerning his description constitutes unsupported, conclusory statements. As such, he argues that the district court erred when considering them as part of the probable cause determination.

When applying for a warrant, an officer must present enough facts to the issuing judge that the judge can "make an intelligent and independent determination that probable cause exists." *State v. Probst*, 247 Kan. 196, Syl. ¶ 3, 795 P.2d 393 (1990). For that reason, "[b]ald conclusions, mere affirmations of belief, or suspicions are not enough." 247 Kan. 196, Syl. ¶ 3. Instead, the affidavit must lay out "sufficient affirmative allegations of fact as to an affiant's personal knowledge to provide a rational basis" to determine whether probable cause exists. 247 Kan. 196, Syl. ¶ 3. If an allegation is without factual support, the issuing magistrate should not consider it. *State v. Hicks*, 282 Kan. 599, 615, 147 P.3d 1076 (2006). In other words, "officers may not rely on conclusory assertions or opinions unmoored from specific factual representations" when applying for a search warrant. *State v. Althaus*, 49 Kan. App. 2d 210, Syl. ¶ 9, 305 P.3d 716 (2013).

9

Grey essentially contends that Detective Hanson's statement about comparing his photograph and biographical information to L.L.'s description and the composite sketch rises to this level of unsupported assertion. A brief review of other cases in this area demonstrates the difference between this affidavit and those lacking factual support. For example, in *Probst*, the defendant successfully challenged a search warrant that discussed another individual's drug activity at length while only circumstantially linking her to any crime. Specifically, the affidavit provided that she (1) had a previous drug conviction, (2) dated the subject of a drug investigation, who sold drugs out of his car while parked near her home, and (3) was linked to the sale of drugs by an informant's unsupported statement. On appeal, our Supreme Court upheld the suppression of evidence, finding "there [was] no factual information in the affidavit to support that the informant [or officers] observed" the defendant participating in drug activity. 247 Kan. at 201. Instead, the affidavit simply linked the defendant to another's behavior, a connection too tenuous to allow a search warrant of the defendant's home. 247 Kan. at 203.

Somewhat similarly, the affidavit in *Althaus* focused not on the defendant but on other people suspected of drug activity. That said, the affidavit linked the defendant to one of these individuals—a woman named Robbin Garcia—through visits to her residence and storage unit. The affidavit also emphasized that police knew Garcia to be involved in drug activity. When the defendant challenged the warrant, the district court determined that the affidavit failed to establish probable cause but applied the good-faith exception to the exclusionary rule. In reversing the district court on the good-faith issue, the *Althaus* court pointed out that the "purported knowledge that various persons use or trade in methamphetamine" constituted opinions without factual support. 49 Kan. App. 2d at 225. To be considered for probable cause purposes, the origin of this knowledge needed to be better explained. 49 Kan. App. 2d at 225-26. In short, the affidavit's failure to "divulge or describe the source" or factual basis of the information rendered it too deficient for the good-faith exception to apply. 49 Kan. App. 2d at 227, 231-32.

10

In *Hicks*, part of the affidavit concerned reports of suspicious activity at the defendant's home. These reports originated from unnamed concerned citizens. However, the affidavit failed to identify or even number the citizens, provided no information about the veracity of their concerns, and excluded details such as when the citizens noticed the behavior and when the police received the reports. Additionally, nothing in the affidavit suggested the police verified or corroborated the information. Based on this lack of factual support and other defects in the affidavit, the *Hicks* court found that no probable cause existed. 282 Kan. at 617

The statements here differ substantially from the previous cases. In the affidavit, Hanson included L.L.'s description of her attacker—his race, height, hair color, and other features. More importantly, Hanson describes how he matched Grey to this description—he studied the composite sketch and multiple photographs of Grey. He specifically names the photograph that led him to conclude Grey could be L.L.'s assailant. Although Hanson failed to exactly lay out what specific parts of Grey's biographical information matched L.L.'s description, the inclusion of the description shows what Hanson considered when linking the two. Moreover, the source of the information is obvious, as Hanson clearly identifies the observations as his own. In other words, these statements are not the vague, tenuous, and unsupported reports at issue in *Probst*, *Althaus*, and *Hicks*. Instead, they are the affiant's first-hand observations about Grey's appearance and biography.

To conclude, the district court properly denied Grey's motion. Neither Koch nor Hanson deliberately misreported the number of unique fingerprint matches on L.L.'s car. Koch treated the lifts separately, and his detailed knowledge of the fingerprints should not be imputed to Hanson. Hanson knew nothing of the fingerprints' location, meaning that the omission of that information was not deliberate. Hanson supported his conclusions about Grey matching L.L.'s description with specific facts. The district court's decision is affirmed.

11

Next, Grey argues the procedure for expert witness discovery in K.S.A. 2013 Supp. 22-3212(c)(2) is unconstitutional. The statute specifically provides that when the defense seeks discovery from the State, it should also "provide for the attorney for the prosecution, no less than 30 days prior to trial, a summary or written report of what any expert witness intends to testify, including the witness' qualifications, the witness' opinions and the bases and reasons for such opinions." Grey contends that because the State is not required to reciprocate and provide the same information about any rebuttal experts, this requirement violated his due process rights.

Whether a statute is constitutional is a question of law over which we exercise unlimited review. *State v. Brown*, 280 Kan. 898, 899, 127 P.3d 257 (2006). However, the State objects to Grey raising this argument at all, contending that the issue is not properly before us because Grey lacks standing.

In order to better understand the State's standing argument, a brief explanation of the facts surrounding Grey's expert is required. Thirty days before trial, Grey submitted a notice of expert witness to the district court. While the notice candidly admitted that Dr. Hodges did not have a written report, it provided a brief overview of his proposed testimony and included a copy of his credentials.

A few days later, the State filed a motion to compel discovery and requested that Grey comply fully with the strictures of K.S.A. 2013 Supp. 22-3212(c)(2). The State argued that Grey's notice included only vague and generalized statements about Dr. Hodges' testimony and therefore fell short of the statute's requirements. If Grey refused to comply, the State asked that the district court bar Dr. Hodges from testifying.

At a pretrial motions hearing, the State again objected to the limited discovery provided by Grey, emphasizing the lack of information about Dr. Hodges' opinions and

12

the bases for those opinions. At that time, Grey provided the State a more detailed description of Dr. Hodges' proposed testimony and offered the State time to interview him. But Grey also argued that Hodges constituted a rebuttal witness rather than the sort of expert contemplated by the statute. According to Grey, Dr. Hodges' testimony would serve only to rebut any evidence from the State regarding DNA and sperm motility. However, the State continued to object to how little detail Grey provided.

Determining that "the witness can be called to rebut any . . . information that the State would present through their expert testimony," the district court ordered that Grey needed to file "a more detailed report on non-rebuttal expert testimony." But the court also reasoned that the statute really concerned "letting [the witness] testify to things that are unknown to the State" and not any rebuttal-type testimony.

The parties revisited the issue at another motions hearing a few days later, where the State objected to the content of Dr. Hodges' proposed testimony and asked that he not be allowed to testify. The State contended that Grey's limited compliance with the expert witness discovery procedure limited its ability to obtain a rebuttal witness to challenge Dr. Hodges' testimony. The State therefore asked that Dr. Hodges be barred from testifying. Grey again argued that Hodges constituted a rebuttal rather than expert witness and served only to respond to the State's evidence. He also contended that K.S.A. 2013 Supp. 22-3212(c)(2) required disclosure only of "an expert who's going to testify about some fact or some issue" not covered by the State's expert witnesses.

After considering all the arguments concerning the nature of Dr. Hodges' proposed testimony and his qualifications, the district court determined that his testimony constituted the type of rebuttal "allowed without the need to follow the particular statute in the particular case." The court based this decision on the fact that Dr. Hodges' testimony was not "any type of a surprise or any type of . . . new scientific opinion." The court therefore ruled to allow Dr. Hodges' testimony despite the State's objections.

13

Later, before Dr. Weaver testified, Grey objected to the State calling him in part because he had received no advanced notice of Dr. Weaver's testimony. Grey couched this objection in due process terms, although he never directly linked his argument to any one statute. In response, the district court asked the State to provide Grey more information about the rebuttal witness and agreed to allow Grey a recess before cross-examination if needed.

Grey renewed his objection to Dr. Weaver's testimony in his motion for new trial. However, as before, he limited his challenge to the lack of notice provided by the State and not the constitutionality of K.S.A. 2013 Supp. 22-3212(c)(2).

Turning now to the State's argument, where the constitutionality of a statute is concerned, the party challenging the statute has standing only to the extent the statute adversely impacts that party's rights. *Ulster County Court v. Allen*, 442 U.S. 140, 154-55, 99 S. Ct. 2213, 60 L. Ed. 2d 777 (1979). For that reason, if there is no constitutional issue in the way a statute is applied to the objecting party, that party lacks standing to challenge the statute on behalf of "third parties in hypothetical situations." 442 U.S. at 155. In other words, the issue of constitutionality can only be raised "by a person directly affected" without invoking the rights of other individuals. *State v. Thompson*, 221 Kan. 165, 172, 558 P.2d 1079 (1976). See also *Moorehouse v. City of Wichita*, 259 Kan. 570, 574, 913 P.2d 172 (1996) (requiring "[t]he party must have personally suffered some injury" in order to have standing).

The State argues that Grey lacks standing because the district court decided against applying the strictures of K.S.A. 2013 Supp. 22-3212(c)(2) to his expert's testimony. And while the statutes in question differ considerably, the court's result in *State v. Coman*, 294 Kan. 84, 90-91, 273 P.3d 701 (2012), helps elucidate the issue. There, the defendant challenged the constitutionality of Kansas's sodomy law based on

14

United States Supreme Court precedent. But while the case the defendant relied on concerned the criminalization of homosexual conduct between consenting adults, the defendant had been charged under the subsection criminalizing bestiality. Because he was not charged under the portion of the statute he believed unconstitutional, the defendant lacked standing to raise the issue at all. 294 Kan. at 90-91.

Despite the vastly divergent facts, the situation here requires the same result as in *Coman*. The court determined that Grey's expert witness constituted a rebuttal witness and therefore fell outside the requirements of K.S.A. 2013 Supp. 22-3212(c)(2). As such, the court declined to apply the statute and allowed Dr. Hodges to testify despite the lack of discovery. Because Grey never had to fully comply with the statute and suffered no adverse consequences from his limited notice, the lack of reciprocity did not directly affect him. To the extent Grey voluntarily complied with the statute out of an abundance of caution, he invited any error stemming from that disclosure. See *State v. Verser*, 299 Kan. 776, 784, 326 P.3d 1046 (2014) (barring litigants from inviting error and complaining about that same error on appeal).

Because Grey lacks standing to raise a constitutional challenge to this statute, we need not consider the merits of his argument. Moreover, because Grey never truly challenged the constitutionality of the statute before the district court and only now briefly justifies hearing it for the first time on appeal, we may elect against considering the argument. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). Additionally, the case Grey relies on most heavily concerns only reciprocal discovery on the topic of alibi witnesses, not all witnesses. *Wardius v. Oregon*, 412 U.S. 470, 473-76, 93 S. Ct. 2208, 37 L. Ed. 2d 82 (1973). More importantly, the statute at issue in *Wardius* "grant[ed] no discovery rights to criminal defendants." 412 U.S. at 475. In contrast, Kansas law provides defendants with many discovery rights. See K.S.A. 2013 Supp. 22-3212. While Grey cites to one unpublished federal case to argue that we should extend *Wardius* to this situation, he ignores the long-standing Kansas rule that "prosecuting

15

attorneys are not required to disclose or endorse the names of rebuttal witnesses," including experts. *State v. Edwards*, 299 Kan. 1008, 1016-17, 327 P.3d 469 (2014).

Moreover, *Wardius*' primary concern laid in the inherent inequality between "requir[ing] a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State." 412 U.S. at 476. But given that Grey clearly only employed Dr. Hodges to refute the State's evidence—a point he repeated several times before the district court—any rebuttal witness from the State would necessarily just reiterate the State's original position. The facts of these case precluded any of the "hazard of surprise" at issue in *Wardius.* 412 U.S. at 476.

In short, even if we would determine that Grey has standing to challenge the statute, the narrow holding of *Wardius* is inapplicable to the present case. The statute is not unconstitutional, and the district court's decision is affirmed.

Grey also argues the district court erred in failing to further redact portions of the interview video. Specifically, he contends that some of the comments by his interviewers shifted the burden of proof by requiring him to explain away certain evidence.

Prior to trial, Grey requested a number of redactions from the interview at issue. When he and the State failed to reach an agreement about these redactions, the parties corresponded with the district court through e-mail. The court granted several of the requested redactions but denied all others, and on appeal, neither party disputes that the statements Grey now objects to are among those denied by the district court.

When the State moved to admit the interview during Hanson's trial testimony, Grey's counsel raised no objections, instead requesting a limiting instruction "based on certain redactions." The next day, however, after Dr. Hanson finished testifying, defense

16

counsel renewed the pretrial objection to the interview. The district court reiterated its earlier ruling, and the trial continued.

K.S.A. 60-404 provides that the erroneous admission of evidence cannot be grounds for reversal absent an objection to that evidence. This rule, often called the contemporaneous-objection rule, requires that the objection be timely, specific, and on-the-record. *State v. Houston*, 289 Kan. 252, 270, 213 P.3d 728 (2009). But even when a party objects to certain evidence in a pretrial motion, the Kansas Supreme Court has held that when that motion "has been denied, the moving party must still object to the introduction of the evidence at trial in order to preserve the issue for appeal." 289 Kan. at 270. This facet of the rule "allows the court to be prepared . . . to reconsider its original ruling" as the evidence unfolds at trial. 289 Kan. at 270. Occasionally, however, our appellate courts elect against strict application of the rule, providing that "the underlying purpose for the rule has been satisfied." *State v. Keenan*, 50 Kan. App. 2d 358, 363, 325 P.3d 1192 (2014), *rev. granted* April 29, 2015.

In arguing that his late objection is sufficient under this rule, Grey points to *Keenan*. There, the district court denied the defendant's pretrial motion to suppress evidence seized from a warrantless search by officers investigating him for a DUI. At trial, the defendant renewed his objection when the State offered the exhibits for admission but after the officers finished testifying. When considering the issue of preservation on appeal, the *Keenan* court determined that the defendant's "slow" objection still satisfied the contemporaneous-objection rule. 50 Kan. App. 2d at 362-63.

Here, however, Grey not only objected after Dr. Hanson finished testifying but long after the State published the interview to the jury. In fact, when asked whether he objected to the interview's admission into evidence, Grey clearly answered in the negative. And unlike in *Keenan*, where the defendant sought to renew his objection to both the officer's observations and the exhibits, Grey's objection here concerns only

certain limited statements from the interview, not Dr. Hanson's testimony in general. Waiting until the close of Dr. Hanson's testimony placed the objection long after the jury viewed the video, removing all elements of contemporaneity.

As previously noted, the purpose of the contemporaneous-objection rule allows the court to reconsider an earlier ruling in light of the trial evidence. See *Houston*, 289 Kan. at 270. By not objecting earlier, Grey prevented the district court from reevaluating its ruling. By the time Grey renewed his objection, the jury had already viewed the video without the requested redactions.

In short, Grey's late objection fails to satisfy the purpose of the contemporaneous-objection rule. Therefore, he failed to preserve the issue for appeal.

Moreover, a brief review of the merits reveals that the district court committed no error. In arguing that the detectives' exhortations that Grey explain himself rise to the level of improper burden shifting, Grey relies primarily on *State v. Elnicki*, 279 Kan. 47, 105 P.3d 1222 (2005). There, the district court allowed the jury to view an interview in which an officer called the defendant a liar or otherwise impugned his credibility eight times. In considering whether the district court erred, The *Elnicki* court observed that although review of the admission of evidence generally falls under an abuse of discretion standard, statements concerning the credibility of witnesses leave the district court no room for discretion and instead "must be disallowed as a matter of law." 279 Kan. at 53-54. After reviewing cases from other jurisdictions, the *Elnicki* court held that a videotaped interview impugning the witness' credibility needed to be treated the same way as live testimony, because "[a] jury is clearly prohibited from hearing such statements from the witness stand." 279 Kan. at 57. In other words, the district court erred by admitting the comments about the defendant's credibility. 279 Kan. at 57.

18

But the statements at issue here differ from those in *Elnicki*. For one, they do not concern Grey's credibility. As such, the district court's decision is properly considered under an abuse of discretion standard, which asks whether "'no reasonable person would take the view adopted by the trial court.'" 279 Kan. at 50. Second, while Kansas caselaw clearly bars prosecutors from trying to shift the burden of proof to the defendant, Grey cites no cases applying this principle to statements in recorded police interviews of the nature here. See *State v. Williams*, 299 Kan. 911, 939, 329 P.3d 400 (2014) (reasserting that a prosecutor cannot misstate the burden of proof or attempt to shift it to the defendant). Even in spite of this general principle, the State is still permitted to comment on weaknesses in the defense's case, such as by "pointing out a lack of evidence to support a defense or to corroborate a defendant's argument regarding holes in the State's case." 299 Kan. at 939-40. Almost all of the statements Grey objects to amount to the detectives pointing out a serious weakness—Grey's lack of explanation. Moreover, as the State observes, none of these comments suggest that Grey *must* explain or defend himself in order to be exonerated. Instead, they simply encourage Grey to keep talking and explain himself.

Finally, the district court correctly instructed the jury on the proper burden of proof. Juries are generally presumed to follow instructions from the district court. *State v. Rogers*, 276 Kan. 497, 503, 78 P.3d 793 (2003). Even if these questions by the officers somehow briefly colored the jury's understanding of the burden of proof, nothing in the record suggests that the jury failed to follow this instruction.

In short, even had Grey preserved the issue, his argument that the detectives somehow shifted the burden of proof onto him is unpersuasive. The district court's decision to admit the less-redacted interview is affirmed.

Affirmed.

19