NOT DESIGNATED FOR PUBLICATION

No. 120,602

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

RONDAL GENZEL,
*Appellant*.

MEMORANDUM OPINION

Appeal from Riley District Court; JOHN F. BOSCH, judge. Opinion filed June 26, 2020. Reversed and remanded with directions.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Bethany C. Fields*, deputy county attorney, *Barry R. Wilkerson*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., WARNER, J., and WALKER, S.J.

PER CURIAM:  A jury in Riley County District Court convicted Defendant Rondal Genzel of one count of rape for sexually molesting the seven-year-old daughter of his live-in fiancée. Given the disputed and comparatively limited evidence of Genzel's guilt, we find that improper testimony from the State's forensic expert on his analysis of DNA samples combined with the prosecutor's unrelated and improper comments in closing

1

argument to the jury rendered the trial unfair and the verdict suspect. We, therefore, reverse Genzel's conviction and remand to the district court for a new trial.

FACTUAL AND PROCEDURAL HISTORY

The morning of March 29, 2017, R.O., the victim in this case, made her usual trip to elementary school with her two older brothers. Roseann Merrick, R.O.'s teacher, quickly noticed the child seemed distracted and out of sorts. Merrick asked if anything was wrong, and R.O. said she would like to speak to the school's social worker. Mona Bass, a para-educator, accompanied R.O. to the social worker's office. The social worker was gone, so Bass offered to talk with R.O. Initially, R.O. said little and began to cry. R.O. kept telling Bass that all she wanted was a daddy. After a while, she confided that Genzel, who she referred to as Ron, had touched her inappropriately. R.O. talked about the touching only generally, but she seemed to suggest there had been repeated incidents. At Bass' request, Merrick then spoke with R.O., who again provided no details about what sounded like ongoing sexual abuse.

A school representative immediately contacted the Riley County Police Department and the Kansas Department for Children and Families (DCF). A police officer spoke with Merrick and Bass and had them write statements. A detective trained in questioning young victims of sexual abuse transported R.O. to Manhattan to conduct a recorded interview of her in a conducive setting at the Child Advocacy Center. A videotape of the detective's 30-minute interview of R.O. was admitted as a trial exhibit and played for the jury, so we outline the content.

R.O. initially spoke in general terms about the abuse. She indicated she frequently snuck out of her bedroom at night to watch television and Genzel would lie on the couch with her. When the detective attempted to elicit specifics about any inappropriate

2

physical contact, R.O. said Genzel touched her only twice and both those incidents occurred the night before. R.O. explained she went into the living room to watch television, as she often did. While she was lying on the couch, Genzel came out of his bedroom and lay down on the couch behind her, facing the same direction. R.O. said Genzel moved his hand under her shorts and digitally penetrated her vagina. R.O. described leaving the couch, going into her mother's bedroom, lying down, and trying unsuccessfully to wake her mother. Genzel followed R.O. into the bedroom, so she got up and went back to the couch. Genzel followed her there and again sexually abused her in the same way. R.O. told the detective she asked Genzel what he was doing and he replied he thought she had something like toilet paper in her pants. R.O. said she reached for her phone to call the police, but Genzel kept pulling her hand away. During the interview, R.O. said she didn't like Genzel even before he touched her.

Another police officer then took R.O. to a Topeka hospital where a nurse trained in conducting forensic examinations of sexual assault victims looked at her. During her trial testimony, the nurse told the jurors that as she started the examination she asked if R.O. knew why she had been brought to the hospital. R.O. replied that it was because somebody had put his hands in her pants. During the examination, the nurse observed some "increased redness" inside R.O.'s vagina. At trial, the nurse agreed the redness was "inconclusive" of sexual abuse and could have been caused in many ways. But the nurse testified child victims of sexual assault often have no injuries or other physical signs of the abuse. The nurse used swabs to collect possible DNA evidence from R.O.'s hands and vaginal area. She swabbed the inside of R.O.'s cheek to obtain what would be a known sample of the child's DNA for comparison. The nurse also retained the underwear R.O. had on the night before, so the garment could be tested for DNA.

3

The detective who interviewed R.O. also spoke with Genzel and R.O.'s mother. Genzel denied any inappropriate physical contact with R.O. He provided a DNA sample and consented to have his hands and other parts of his body swabbed for DNA evidence.

While the criminal investigation continued, R.O. was removed from the household and placed in emergency protective custody. The county attorney filed a child in need of care case to determine who should have ongoing physical and legal custody of R.O. In that case, DCF placed R.O. in the temporary physical custody of Merrick, her teacher. R.O. began living with her natural father about seven months later. He had been residing in Oregon and returned to Riley County. R.O.'s father had struggled with substance abuse—a circumstance that, in part, prompted his move to Oregon and figures in the issues on appeal.

On April 20, 2017, the county attorney charged Genzel with two counts of rape, an off-grid felony. See K.S.A. 2019 Supp. 21-5503. As defined in the Kansas Criminal Code, unlawful sexual intercourse constituting rape includes digital penetration of the female genitalia. See K.S.A. 2019 Supp. 21-5501(a) (defining sexual intercourse); K.S.A. 2019 Supp. 21-5503(a)(3) (criminalizing sexual intercourse with child under 14 years of age).

The five-day jury trial was held in mid-August 2018. R.O. testified and told the jurors that Genzel had touched her vagina while she was lying on the couch. But her recollection of some of the circumstances differed from what she had told the detective in the forensic interview. Perhaps most significantly, R.O. testified that Genzel touched her inappropriately only once rather than twice. She recalled asking Genzel what he was doing and getting no response. R.O. described going to her bedroom and having Genzel follow her there. She testified she went to her mother's room only after that and stayed there until morning.

4

We outline other trial evidence material to this appeal:

• The State introduced Genzel's conviction in 2010 in Geary County on his plea of guilty to a reduced charge of aggravated indecent solicitation of a child, a felony violation of what was then K.S.A. 21-3511. Genzel touched the pubic area of his 11-year-old stepdaughter while they were lying on a couch. Genzel and the victim's mother divorced.

At the trial, Genzel and S.G., R.O.'s mother, testified they had talked with R.O. and her brothers about the Geary County conviction well before R.O. disclosed what happened to her. They did so by way of explaining why Genzel could not accompany them to events or places where there might be other children. The explanation included a general description of what Genzel had done.

• Genzel testified that he never touched R.O. inappropriately. S.G. testified as a defense witness and was supportive of Genzel. She testified that she and Genzel had told the children they were planning to get married, confirming what R.O. had said in response to questions from Genzel's lawyer. R.O. agreed with the lawyer that her mother marrying Genzel would mean "a lot of change" and seemed "pretty scary." S.G. also told the jurors R.O. recanted her accusations against Genzel during a family therapy session.

• R.O. went to soccer practice after school on March 28, but the session was rained out partway through. S.G. told the jurors that when she arrived, R.O. begged to stay overnight at the coach's house. S.G. said she couldn't because it was a school night. According to S.G., R.O. threw "a tissy fit" and went straight to her room, slamming the door behind her when they got home.

Later that evening, S.G. and Genzel went to a bar, along with Michael Marinella, a friend of theirs. S.G. drank heavily and became upset, so Genzel took her home and returned to the bar. S.G. testified that she checked on the children and went to bed. The trial evidence showed Genzel and Marinella stayed until closing. Genzel then propositioned the female bartender as she was getting ready to leave. She declined, reminding Genzel she was married and he was engaged. When the prosecutor questioned him about the incident, Genzel agreed he had suggested a liaison to the bartender but probably on a different occasion.

• Lance Antle, a forensic biologist with the KBI, testified that he made DNA comparisons of evidence submitted in this case with the known DNA samples from R.O. and Genzel. We recount the testimony in some detail because it provides the foundation for one of the issues Genzel has raised on appeal. After explaining generally the method for conducting a DNA comparison, Antle testified that he found DNA consistent with R.O. on the swab taken from her vaginal area. In response to the prosecutor's questions, Antle explained that female DNA contains no X chromosome and male DNA contains an X chromosome and a Y chromosome. The test method he used showed no Y chromosomes. The prosecutor then asked Antle if he could have used a different test. He said he could have and didn't. Antle then seemed to qualify his earlier answer and started to say that the testing he did showed that "[t]here was a tiny, tiny bit of male DNA found in—" Genzel's lawyer cut off the answer with an objection. The district court responded simply, "Sustained."

The prosecutor then asked Antle about the swabs from Genzel's hands. They had a mix of DNA from Genzel and a second person. But the amount of DNA from the second person was insufficient to match it to a known sample, such as the one from R.O. Antle testified that the underwear had DNA consistent with only R.O.

On cross-examination, Genzel's lawyer had Antle explain how one person can leave trace DNA by touching an object and another person can pick up that DNA by touching the same object. And, in turn, a swab of the second person's hand could include DNA from both of them. During the lengthy cross-examination, Genzel's lawyer asked Antle to confirm that he did not specifically identify male DNA on the swabs of R.O. He replied that was correct as to swabs from her hands. Asked about "the other swabs" from R.O., Antle said, "[T]here's a tiny bit of DNA detected on the—." The lawyer cut Antle off with another question. The lawyer then challenged Antle with the report he prepared on his DNA analysis, which he furnished to the State and was later turned over to the defense. Antle agreed the report contained no reference to any male DNA on the swabs or underwear obtained from R.O.

Immediately after Antle finished his testimony and the jury was dismissed for lunch, Genzel's lawyer requested a mistrial because Antle had referred to male DNA being present in the DNA samples from R.O.—information that was not included in his final report the State produced before trial. Genzel pointed out that trial testimony from expert witnesses called by one party typically cannot differ materially from the opinions they have disclosed in their reports disseminated to opposing parties in pretrial discovery. A contrary rule invites unfair surprise. See K.S.A. 2019 Supp. 22-3212(b)(2) (duty to provide "summary or written report" of opinions expert witness expected to testify to at trial); *State v. Grey*, 46 Kan. App. 2d 988, 998, 268 P.3d 1218 (2012) (admission at trial of material opinion not disclosed in expert report State disclosed to defense created reversible error); *McGuire v. Wesley Rehab. Hosp.*, No. 99,204, 2009 WL 454941, at *3 (Kan. App. 2009) (unpublished opinion). The district court denied the motion.

At the close of the State's case, the district court granted Genzel's motion for judgment of acquittal in part and dismissed one of the rape counts. The district court found sufficient evidence to submit the other count to the jury. The district court's

7

dismissal is the equivalent of a jury finding of not guilty, making it an unappealable ruling except as a question reserved that would not affect the defendant's substantive rights. See *State v. Wilson*, 261 Kan. 924, Syl. ¶ 2, 933 P.2d 696 (1997). The State has not sought that limited review of the ruling. The jury convicted Genzel of the single remaining count of rape. The district court denied Genzel's posttrial motions and in December 2018 ordered Genzel to serve life in prison with his first parole eligibility after 25 years, reflecting the standard statutory sentence. Genzel has appealed.

## LEGAL ANALYSIS

On appeal, Genzel raises three substantive points: (1) In her closing argument, the prosecutor made two impermissibly prejudicial statements to the jury depriving him of a fair trial; (2) the district court erred in denying his motion for a mistrial; and (3) the district court refused to admit evidence that R.O. had made a false accusation that her father was abusing alcohol and drugs after she was placed in his custody. Genzel has also argued the cumulative effect of those errors so tainted his trial as to require reversal of the conviction. We find the prosecutor's closing argument combined with the expert's reference to detecting male DNA in the biological evidence taken from R.O. constituted prejudicial error. The error cannot be discounted as harmless, given the other limited and conflicting evidence of Genzel's guilt. Although we did not weigh the district court's exclusion of R.O.'s accusation about her father in our determination of reversible error, we discuss the point because it may come up in a retrial.

*Prosecutor's Closing Argument*

Genzel challenges two aspects of the rebuttal arguments the prosecutor delivered to the jurors after his lawyer had concluded his remarks as to why they should return a not guilty verdict. Because the State bears the burden of proof in a criminal case, the

8

prosecutor gets to open and close the final arguments to the jurors, thus surrounding the defense lawyer's comments. The rebuttal argument can and ought to be a powerful tool of persuasion, since it entails virtually the last words the jurors hear in the trial before they begin their deliberations. Before turning to the prosecutor's precise statements, we outline the principles governing the boundaries of proper jury argument and how to assess the impact of a lawyer's potentially errant remarks.

Closing argument affords the lawyers the opportunity to discuss how the jurors should evaluate the evidence and how that evidence guides their application of the law in the district court's written instructions to reach a verdict. Advocates are expected to use that opportunity to their respective client's advantage and have "wide latitude" in drawing inferences from the evidence and in fashioning rhetorically striking arguments. *State v. King*, 288 Kan. 333, 351, 204 P.3d 585 (2009) (noting prosecutor's "'wide latitude'" in arguing case for "'a just conviction'"); *State v. Rodriguez*, 269 Kan. 633, 643, 8 P.3d 712 (2000) (closing argument not improper simply because of "impassioned . . . oratory" or "picturesque speech").

But arguments may not stray from settled rules designed to make the trial process an exploration for the truth in service of a fundamentally fair result. Just as the lawyers are bound by the rules of evidence in questioning witnesses and offering exhibits, they may not intentionally mischaracterize the evidence in arguing to the jurors. See *State v. Anderson*, 294 Kan. 450, 463, 276 P.3d 200 (2012). Nor should they refer to factual information outside the admitted evidence. *State v. Thurber*, 308 Kan. 140, 162, 420 P.3d 389 (2018). They may not offer their personal opinions about the significance of specific evidence and particularly who among the witnesses should be believed or disbelieved. *State v. Peppers*, 294 Kan. 377, 396, 276 P.3d 148 (2012). They may not misstate the law or invite the jurors to disregard the law. *State v. Tahah*, 302 Kan. 783, 791, 358 P.3d 819 (2015). And they may not deploy oratorical bombast that does no more than vilify the

9

opposing side or invite sympathy for their own side. See *Thurber*, 308 Kan. at 162 (argument may not "'inflame the passions or prejudices of the jury'" diverting from facts and law); *Anderson*, 294 Kan. at 463 (argument improper when designed to "obtain a conviction based on sympathy"); *State v. Gammill*, 2 Kan. App. 2d 627, 631, 585 P.2d 1074 (1978) (referring to defendant as "an animal" in closing argument "definitely improper"). Those constraints weigh perhaps most heavily on prosecutors, since their ultimate duty calls for ensuring a fair adjudication of a criminal defendant rather than simply racking up a conviction. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016) (wide latitude extended prosecutors must be exercised within duty "to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial"); *State v. Pabst*, 268 Kan. 501, Syl. ¶ 6, 996 P.2d 321 (2000) (overarching "interest" of State, and its legal representative, in criminal prosecution "is not that it shall win a case, but that justice shall be done").

In *Sherman*, the Kansas Supreme Court recalibrated how to assess prosecutorial error in closing arguments. 305 Kan. at 109. The analytical model first considers whether an error has occurred and then weighs any prejudice to the defendant resulting from the error. Comments made during argument will be considered error if they fall outside that wide latitude afforded a prosecutor in discussing the evidence and the law. 305 Kan. at 109. This simply transplanted the initial step in the former process, though substituting the term "error" for "misconduct," a more pejorative label at least connoting a deliberate violation of the rules even when there might be only an inadvertent mistake. 305 Kan. at 104-05. If an appellate court finds the challenged argument to be prosecutorial error, it must then consider prejudice measured by the test set out in *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), for a constitutional wrong. The State, as the party benefiting from the error, must demonstrate "'beyond a reasonable doubt'" that the mistake "'did not affect the outcome of the trial'" taking account of the full trial record. 305 Kan. at 109 (quoting *Ward*, 292 Kan. 541, Syl. ¶ 6). That is, the appellate court must

determine if the error deprived the defendant of a fair trial—a constitutional protection rooted both in due process and in the right to trial itself. 305 Kan. at 98-99, 109. The prejudice analysis in *Sherman* replaced a multifactor standard that also considered the prosecutor's bad intent or ill will—breaches of professional conduct the court concluded could be more pointedly addressed in other ways. 305 Kan. at 114-15.

We apply those principles to what Genzel has alleged to be dual errors in the prosecutor's closing argument. One of the prosecutor's comments is quite brief; the other is an extended entreaty. We consider the shorter commentary first. In the rebuttal argument, the prosecutor told the jurors:

> *"Ladies and gentlemen, the guilty people get charged with crimes that they did do, and it's up to you to decide whether or not this defendant is guilty.* The State has to prove the case to you beyond a reasonable doubt and you decide if [R.O.] is believable or not." (Emphasis added).

Genzel contends the italicized statement primarily amounts to an impermissible expression of the prosecutor's personal opinion and secondarily denigrates the presumption of innocence that attaches to criminal defendants. See *Ward*, 292 Kan. at 570 (presumption of innocence entails fundamental protection embedded in Sixth Amendment right to jury trial and in Fourteenth Amendment due process rights). On appeal, the State counters that the argument properly fell within the bounds afforded prosecutors and simply invited the jurors to convict Genzel if the evidence proved him guilty.

Although the precise meaning of prosecutor's remark isn't readily apparent, we fail to see an obvious expression of personal opinion about the evidence generally or Genzel's credibility particularly. By the same token, however, we fail to see an entirely benign suggestion simply to find Genzel guilty should the

11

evidence warrant it. As rendered, the statement seems to trade on the notion that criminal defendants are likely guilty because they have been charged or the related notion that only guilty people get convicted. Either way, the remark does impermissibly diminish the presumption of innocence and, therefore, reflects prosecutorial error.

On appeal, the State suggests the prosecutor's statement was offered in response to a comment Genzel's lawyer made in his closing argument to the effect he "practice[s] law . . . to make sure that protocols are followed because when you don't, innocent people get charged with stuff they didn't do." The comment from Genzel's lawyer also comes across as at least problematic by raising the specter of wrongful convictions in other cases, a recurring topic in the news media. But a prosecutor's proper response to an improper defense argument is an objection—not a similarly improper rebuttal argument. See *State v. Sprague*, 303 Kan. 418, 428-29, 362 P.3d 828 (2015). So that doesn't undo the error.

Under *Sherman*'s prejudice analysis, we are not prepared to say the prosecutor's comment deprived Genzel of a fair trial. The remark was a fleeting (and obscure) statement in an extended closing argument at the end of a lengthy trial. As we have suggested and as the lawyers argued to the jurors, this case pivoted on the credibility of R.O. and Genzel. This remark did not cause the tide to turn one way or the other. It was not reversible error standing alone, but it should be weighed in assessing cumulative error.

Genzel's other claim of prosecutorial error focuses on a more elaborate pitch from the rebuttal argument that is unquestionably improper. The prosecutor began that portion of her argument with a rhetorical question as to who knew

12

about Genzel's 2010 conviction for sexually abusing his stepdaughter. She continued this way:

> "The mother did, and with that knowledge, [R.O.]'s mother failed to protect her. Although she told Dana Wilson [a DCF caseworker] that she would do whatever was necessary to protect [R.O.], [S.G.] did not protect [R.O.] when she allowed, actually, when she invited a convicted sex offender to become a part of their family.
> "Are you surprised that [R.O.] was then molested by the defendant?
> . . . .
> "On March 29th, 201[7], [R.O.]'s father was in Oregon and not able to protect her. [R.O.]'s mother . . . was being drunk and belligerent . . . , so she was in no condition to protect [R.O.], and who is the mother protecting, the defendant.
> "The mother testified that she takes care of herself, the mother's needs come first. That she—but however, she cannot admit that she messed up to having a convicted sex offender live in her home with her young daughter. She wants to say that they did all of this to keep it from happening, but wouldn't it have been easier for the mother just to decide not to date the defendant?
> "Not to introduce him to her children; not to allow him to spend time alone with [R.O.]?"

At that point, Genzel's lawyer interposed an objection that S.G. was not on trial. Without directly ruling on the objection, the district court suggested to the prosecutor, "[L]et's move on." The prosecutor didn't and finished that piece of the rebuttal argument:

> "The mother put herself first instead of putting the child first, instead of putting [R.O.] first.
> "On March 29th, 2017, the defendant, [R.O.]'s father figure, failed to protect her. He took advantage of her."

Genzel submits the prosecutor's remarks amounted to an extended request to the jurors to protect R.O. with their verdict after the most prominent adults in her life effectively abandoned or abused her. He characterizes the argument as an improper

13

appeal to the jurors' raw emotions rather than as a reasoned explanation of the facts or the law. The State counters that the prosecutor did not ask the jurors to bring back a guilty verdict because the adults around R.O. had failed to protect her. The remarks, therefore, were appropriate.

As we have indicated, we do not see a proper purpose behind what the prosecutor crafted as an extended rebuttal argument focusing on how R.O.'s mother and father turned their backs to an obvious risk to her physical and emotional well-being. The argument, however, has little to do with Genzel's guilt or innocence or the evidence against him. The argument faults them for allowing Genzel, as a convicted sex offender, to be around R.O. at all. But that fault neither tends to prove nor tends to disprove R.O.'s accusation. Likewise, after R.O. accused Genzel, S.G. essentially backed him rather than her daughter. Again, that choice isn't evidence of Genzel's guilt or innocence. So the prosecutor's lengthy commentary on R.O.'s parents does not serve the proper purposes of a closing argument in offering a reasoned analysis of the evidence or law as supporting Genzel's guilt. Rather, the argument implies in a not very veiled manner that the jurors will have failed to protect R.O. in much the same way as her parents—particularly her mother—if they don't convict Genzel.

In *State v. Tosh*, 278 Kan. 83, 92-93, 91 P.3d 1204 (2004), the Kansas Supreme Court found a comparable closing argument to be both improper and a material factor in depriving the defendant of a fair trial on charges he had sexually assaulted his 16-year-old daughter. In concluding the first part of his closing argument, the prosecutor in *Tosh* told the jury: "'When [K.T.] was little, and even today, her father failed to protect her. He raped her. You can protect her. You can find him guilty. Thank you.'" 278 Kan. at 92. Without much elaboration, the court readily characterized the comment as an impermissible appeal to the jurors' "sentiments" rather than an argument grounded in the evidence or the law. 278 Kan. at 92-93. The court found that error in combination with

14

another impermissible jury argument and highly improper questions the prosecutor posed to the defendant on cross-examination rendered the trial fundamentally unfair. 278 Kan. at 94-95. In coming to that conclusion, the *Tosh* court was particularly dismayed by the cross-examination and applied a test for reversible error that has since been substantially retooled in *Sherman*. But the court's treatment of the argument as improper remains undiminished, and we consider *Tosh* for that reason.

On appeal, the State tries to distinguish the improper argument in *Tosh* in two ways. First, the prosecutor in that case referred only to the defendant as failing to protect the victim, while here the remarks concerned R.O.'s mother and father. But that effort miscasts the argument in this case. To be sure, the prosecutor told the jurors R.O.'s parents didn't protect her. But after the district court told the prosecutor to "move on" with her closing comments, she specifically told the jurors that Genzel didn't protect R.O. and "took advantage" of her. In its entirety, the argument not only replicated what *Tosh* held objectionable but extended that improper theme.

Second, the State points out the prosecutor in *Tosh* explicitly implored the jurors to protect the victim in that case by convicting the defendant and there is no identical exhortation here. But, as we have indicated, the explicit (and extended) commentary depicts the abandonment of R.O. by both of her parents and her abuse at the hands of Genzel, who at least in the prosecutor's remarks is portrayed as a "father figure" to her. The obvious, though implicit, message to the jurors is that they need to protect R.O. by convicting Genzel and they, too, will have abandoned her if they don't.

Here, the prosecutor's comments were considerably more elaborate than those the court found to be improper in *Tosh*. They rest on the ostensible indifference of R.O.'s father and her mother's near complicity in the sexual abuse and conclude with Genzel's betrayal of the child. Looking at the verbal picture the prosecutor painted for the jurors,

15

we find little to nothing in the way of a reasoned argument for conviction based on the evidence or the law. The prosecutor constructed a theme—this was no off-hand aside—advancing an impermissible emotional appeal to the jurors as guardian angels of victimized children rather than as objective finders of fact determining whether to convict a defendant. The argument was substantial, deliberate, and indisputably inappropriate. In short, it was, by any measure, prosecutorial error.

The second step of the *Sherman* analysis poses the far more difficult question: Whether the error so prejudiced Genzel as to undermine his right to a fair trial. We choose not to decide if this improper argument standing alone rose to the level of reversible error and offer our assessment as part of our consideration of cumulative error.

*Denial of Mistrial*

On appeal, Genzel contends the district court should have granted his request for a mistrial because Antle twice mentioned finding a miniscule amount of male DNA in the biological evidence taken from R.O.—information omitted from his pretrial report that fairly might be considered a material qualification of his reported conclusion that Genzel could not be linked to that evidence. We have already detailed Antle's testimony pertinent to this issue and do not repeat it here.

Genzel sought a mistrial on the grounds Antle's mention of male DNA in the swabs from R.O. constituted what the statute governing mistrials identifies as "prejudicial conduct" making it "impossible" to continue the trial "without injustice" to him. K.S.A. 22-3423(1)(c). The statutory standard for granting a mistrial is, in a word, stringent. If circumstances create prejudice that may compromise either side's interest in a just result, the district court should first consider whether the damaging effects can be eliminated or adequately mitigated with a curative jury instruction, an admonition, or some other

16

remedy short of a mistrial. If the harm cannot be fully erased, the district court must determine whether the residual prejudice creates an injustice. Only then should a district court declare a mistrial. *State v. Moyer*, 302 Kan. 892, 906, 360 P.3d 384 (2015).

As a general matter, a district court's ruling on a motion for a mistrial lies within its sound judicial discretion. An appellate court reviews the ruling for abuse of discretion. 302 Kan. at 906. Judicial discretion is abused when the district court's decision rests on either an error of law or unsupported facts or is otherwise arbitrary, fanciful, or unreasonable, meaning no other judicial officer could have come to the same conclusion in a comparable situation. *State v. Williams*, 303 Kan. 585, 595-96, 363 P.3d 1101 (2016). As the party asserting an abuse of discretion, Genzel bears the burden of establishing his claim. See *State v. Robinson*, 303 Kan. 11, 90, 363 P.3d 875 (2015).

Antle's references to having detected male DNA created a problem and prejudiced Genzel. Given the context of those comments in his overall testimony, Antle was talking about biological evidence retrieved from R.O.'s body other than her hands as the source of the DNA, even though he never said precisely that. Moreover, given the evidence at trial, Genzel would have been the only likely source of the male DNA. So the inference was of DNA linking a man to biological evidence taken from R.O.'s vaginal area. That's not exactly good for the defense in this case, since it corroborates some version of R.O.'s account of being abused and undercuts Genzel's denial and the necessary corollary that R.O. fabricated her accusation.

The district court sustained an objection from Genzel's lawyer to Antle's first mention of finding male DNA. The district court did not specifically instruct the jurors to disregard what they had heard immediately before the objection. But Genzel's lawyer never asked the district court to so advise the jury as an alternative to his request for a mistrial.

17

Antle's two references to finding male DNA were brief and incomplete. He never described fully exactly where the DNA was found, and he certainly never discussed what significance he, as an expert witness, attached to that information. Conversely, Antle testified that he did not find Genzel's specific DNA profile to be forensically consistent with any DNA recovered from R.O.'s body or clothing.

In the abstract, we are not disposed to say the district court abused its discretion in denying the motion for a mistrial. The district court understood the law and grasped the testimony. We expect there are other district courts that would have ruled the same way. All of that more or less fits within the wide berth for judicial discretion. Given our ultimate decision to grant Genzel a new trial based on cumulative error, we need not and do not definitively say the court erred.

As we have indicated, and as the State agrees on appeal, Antle should not have testified about discovering male DNA in his examination of the biological evidence because that opinion was not included in his report the prosecution furnished the defense before trial. By statute, the pretrial disclosure must identify the opinions an expert witness will offer at trial. K.S.A. 2019 Supp. 22-3212(b)(2); *Grey*, 46 Kan. App. 2d at 998. Deviation from that rule creates an impermissible trial by ambush, substantially impairing the opposing party's ability to adequately prepare to confront an expert witness. We, therefore, consider Antle's testimony in assessing cumulative error.

*False Accusation Theory*

On the second day of trial, Genzel's lawyer requested a hearing outside the presence of the jury to obtain a prospective ruling from the district court on the admissibility of evidence purportedly showing R.O. made a false accusation that her

18

father had been drinking to excess and using illegal drugs after she had been placed in his custody. The lawyer proffered to the district court that Merrick would testify that R.O. had come to her house and reported that her father was intoxicated. Merrick reported this to DCF. The agency promptly had R.O.'s father tested, and the results were negative for both alcohol and drugs.

Based on the proffer, Genzel wanted to admit the evidence to show R.O. deliberately made a false accusation about her father and that, in turn, supported the defense theory she similarly made a false accusation of sexual abuse. Genzel suggested a common motive. R.O. was angry with Genzel and her mother because she could not stay over with her coach after soccer practice and more generally she disliked Genzel and didn't want her mother to marry him. So an angry and manipulative R.O. falsely accused Genzel of the same sort of conduct he had been convicted of seven years earlier. Later, after R.O.'s father returned from Oregon and she went to live with him, she was unhappy with the arrangement. R.O. falsely accused him of getting drunk and using illegal drugs, which he had done in the past, in the hopes she would get to live with Merrick again.

The district court denied Genzel's request to present that evidence to the jury. The district court concluded the accusation R.O. made about her father was, at best, inadmissible evidence of a specific instance of her untruthfulness being offered to prove a character trait for lack of honesty or veracity. Genzel has appealed the ruling and contends the exclusion of the evidence amounted to reversible error.

The district court correctly recognized that the Kansas Code of Evidence limits the ways a witness' character trait for "honesty or veracity or their opposites" may be proved. K.S.A. 60-422(c). The proof is commonly confined to reputation or opinion evidence. See K.S.A. 60-422(c), (d); K.S.A. 60-446. That is, a person with knowledge of what others in the community say about the witness' reputation for veracity may testify to that

19

reputation. Similarly, a person with substantial direct interactions with the witness may offer an opinion of the witness' veracity derived from those dealings. But the rules expressly exclude evidence of specific instances of the witness' conduct—that he or she was truthful or untruthful on a particular occasion. K.S.A. 60-422(d). The reason is a pragmatic one. Specific instance evidence may not be especially probative of a character trait. Even characteristically truthful people sometimes tell lies, and conversely liars may tell the truth from time to time. The proof of multiple specific instances of a witness' truthfulness or prevarication would consume a great deal of time and become a sideshow detracting from the central issues in a case.

But we don't understand the theory to be that R.O. was an inveterate liar. Rather, Genzel says she was an exceptionally strategic liar, deliberately telling significant falsehoods in rare instances to substantially alter her familial environment to be more to her liking. That's something different from a general character trait for untruthfulness and advances a theory rooted in a common scheme or motive. Evidence of specific instances of conduct presumably would be admissible if those instances were probative of an otherwise material scheme or motive.

Probative evidence has some "tendency in reason to prove a fact" and is one component of relevance. We typically review a district court's determination of probativeness for abuse of discretion. *State v. Boleyn*, 297 Kan. 610, Syl. ¶ 1, 303 P.3d 680 (2013). In turn, the evidence must be material, meaning it has some bearing on a disputed fact having legal significance in the case. That's the other component of relevance. We may assess materiality without deference to the district court. *Boleyn*, 297 Kan. 610, Syl. ¶ 1. And evidence may be admitted for a proper purpose even though it may be inadmissible for some other purpose. K.S.A. 60-406 (recognizing admissibility of relevant evidence for limited purpose). We think R.O.'s complaint about her father could

20

be material if Genzel's theory behind it were established, since it would have some circumstantial relevance to the veracity of the sexual abuse charge.

On appeal, Genzel relies, in part, on a decision of this court that recognized a narrow rule allowing a putative victim in a sex crimes prosecution to be impeached with evidence he or she had made false allegations of similar abuse on another occasion. *State v. Barber*, 13 Kan. App. 2d 224, 227, 766 P.2d 1288 (1989). The court reasoned that in sex crime prosecutions, a defendant's right to confrontation guaranteed in the Sixth Amendment to the United States Constitution overrides the limitation in K.S.A. 60-422(d) precluding specific instance evidence to prove the victim's character trait for veracity or its opposite. 13 Kan. App. 2d at 226. Well into the twenty-first century, the narrow impeachment rule announced in *Barber* rests on a disquieting judicial-thumb-on-the-scales approach to sex crimes in which most victims are female. The impeachment evidence in *Barber* really did not bear so much on the victim's general character trait for veracity (or its opposite) but on her purported disposition to make false claims of sexual abuse—the precise kind of claim at issue in the criminal case.

In any event, the *Barber* court affirmed the district court's ruling excluding the proffered evidence because the defendant failed to show the victim's earlier allegations of sexual abuse made on several occasion against the defendant and others were false. 13 Kan. App. 2d at 227. In other words, the other accusations were not probative of the victim's untruthfulness, since they were not demonstrable lies. We read *Barber* as fashioning a rule admitting evidence that the victim in a sex crimes prosecution had lied about being sexually abused on some other occasion. The rule, then, does not apply here, and we are not disposed to extend *Barber* by analogy to some different factual setting.

That brings us back to Genzel's proffer of R.O.'s representation about her father's insobriety. As presented, the proffer shows R.O. was mistaken about her father being

21

intoxicated when she spoke to Merrick. But nothing in the proffer showed R.O. deliberately falsified her account, i.e., she lied about her father. That would be an inference. Similarly, nothing showed that if R.O. lied, she did so to get away from her father or to return to Merrick's custody. That would be another inference. The proffer becomes probative of an improper scheme or motive only by indulging those sequential inferences. And its benefit to Genzel then depends upon the ultimate sequential inference: R.O. lied about Genzel to oust him from the household, just as she lied about her father.

From our vantage point, the proffer relied on too much inference and not enough fact, especially as to why R.O. spoke to Merrick about her father. Genzel's theory then superimposes pyramiding inferences upon the initial inference that R.O. must have lied to Merrick. That looks to be impermissible inference stacking. See *In re Estate of Rickabaugh*, 51 Kan. App. 2d 902, 910, 358 P.3d 859 (2015), *aff'd* 305 Kan. 921, 390 P.3d 19 (2017). Even if the proffer were minimally relevant, its heavily inferential character might well render it unduly prejudicial and, thus, inadmissible. See *State v. Phillips*, 295 Kan. 929, 948, 287 P.3d 245 (2012) (district court may exclude otherwise relevant evidence if resulting undue prejudice outweighs probative value).

Given the record on this point, we are not prepared to say the district court came to the wrong conclusion in excluding R.O.'s statement to Merrick about her father's purported intoxication and the related evidence indicating he was sober, despite how it framed and resolved the evidentiary issue. See *State v. Smith*, 309 Kan. 977, 986, 441 P.3d 1041 (2019). We, therefore, find no prejudicial error in the ruling.

That said, because we are remanding for a new trial, the district court may revisit the question. We view that as particularly appropriate here because determining the probativeness of proffered evidence is entrusted to the district court's sound discretion.

Genzel's lawyer may renew the request to admit evidence related to R.O.'s report about her father's insobriety, presumably buttressing the renewed proffer with provable facts.

*Cumulative Error*

As his final point, Genzel argues the cumulative effect of the errors in the district court deprived him of a fair trial. Appellate courts will weigh the collective impact of trial errors and may grant relief if the overall impact of the imperfections deprived the defendant of a fair hearing even when the errors considered individually would not necessarily require reversal of a conviction. *State v. Harris*, 310 Kan. 1026, 1041, 453 P.3d 1172 (2019); *State v. Smith-Parker*, 301 Kan. 132, 167-68, 340 P.3d 485 (2014). An appellate court examines the entire trial record to assess the aggregate effect of multiple trial errors. 301 Kan. at 167-68. The assessment takes account of "how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence." *State v. Miller*, 308 Kan. 1119, 1176, 427 P.3d 907 (2018).

Here, the evidence against Genzel was not overwhelming. Going into the trial, the case essentially pitted the credibility of Genzel against the credibility of R.O. The State's case was ostensibly bolstered with the propensity evidence of Genzel's conviction for a factually similar sexual assault of his former stepdaughter. But Genzel suggested he and R.O.'s mother had told R.O. and her brothers about the conviction. Genzel argued that supplied R.O. with details to falsely accuse him out of spite, antipathy, and a desire to torpedo his marriage to her mother. R.O. didn't reveal the sexual abuse in an overt way and appeared reticent to discuss what happened. Her near contemporaneous accounts, however, differed from her trial testimony, most notably as to the number of times Genzel assaulted her. The State's forensic evidence disclosed to the defense and properly admitted at trial, including the DNA analysis, did not corroborate (or disprove) R.O.'s

23

accusation. Genzel, of course, consistently denied sexually assaulting R.O. and repeated his denial from the witness stand during the trial.

As a gross generalization, the trial evidence presented a mixed bag. The evidence did not tilt overwhelmingly in favor of either the State or Genzel. For a not guilty verdict, Genzel simply had to generate a reasonable doubt about the State's key evidence.

Without repeating all that we have discussed thus far, we conclude that the problems with the prosecutor's closing argument combined with the forensic expert's improper reference to having found male DNA in the biological samples taken from R.O. sufficiently undermined the fairness of the jury trial to call into question the verdict. The prosecutor's extended description in closing argument of R.O. having been left unprotected—abandoned—by the adults closest to her injected entirely improper and highly corrosive emotional considerations. Though unspoken, the clear implication to the jurors placed them in the position of either protecting or abandoning R.O. with their verdict. That implication cannot be reconciled with the jurors' duty to impartially weigh the evidence to determine what happened and to then apply the law to their factual determinations. The dissonance between the prosecutor's pitch and the jurors' duty would have been especially pronounced here with a charge of sexual abuse of a young child by an adult well known to her.

The prosecutor's closing argument further eroded Genzel's right to a fair trial with the reference to guilty people being charged with what they have done. The remark improperly trod upon the presumption of innocence, a cornerstone of the criminal justice process. The combined effect of those improper arguments substantially impaired the fairness of the trial.

24

The DNA expert's testimony generated a different sort of challenge to the fairness of the trial by impermissibly introducing opinion evidence that should not have been in front of the jury. The brief references to male DNA in the biological material collected from R.O. constituted both undue surprise and tangible prejudice to the defense. Although the district court took steps to mitigate the harm, the comments came with the aura of a scientific foundation. They represented an anchor of factual reliability amidst conflicting testimony and otherwise inconclusive forensic evidence. While we have found the district court acted within its discretion to deny the motion for a mistrial, we may (and should) consider the expert's remarks in assessing cumulative error.

We do not consider whether those comments and the district court's handling of the objection to them created reversible error, since Genzel has not formally pressed that point. The jurors heard the references to male DNA and may well have been swayed by them, despite Genzel's objection and the district court's taciturn response sustaining the objection.

So there were errors on two fronts—one infected the forensic evidence, and the other infected the final closing argument from the prosecutor. Each, of course, favored the State in a case that the prosecutor and Genzel's lawyer vigorously litigated on facts that were both disputable and disputed. The trial record left the jurors with no simple task in sorting out the evidence and arriving at a verdict, given the heavy burden of proof on the State to convict. We believe the process faltered under the collective weight of those errors—the trial ceased to be fair at the last when the prosecutor improperly exhorted the jurors to find Genzel guilty, and the verdict, though rendered in good faith, cannot be accepted as sufficiently reliable to meet the exacting standards required in a criminal case.

Reversed and remanded with directions to grant Genzel a new trial.