NOT DESIGNATED FOR PUBLICATION

No. 121,296

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

NORRIS M. HUNTER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Douglas District Court; JAMES R. MCCABRIA, judge. Opinion filed February 12, 2021. Affirmed.

*Carol Longenecker Schmidt*, of Kansas Appellate Defender Office, for appellant.

*Kate Duncan Butler*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., HILL and BUSER, JJ.

PER CURIAM: This is Norris M. Hunter's direct appeal of his convictions of aggravated robbery, battery, aggravated burglary, and theft. He raises two procedural errors. Specifically, he claims the trial court erred when it prevented him from calling his brother to offer limited testimony at the trial. In his second claimed error, Hunter argues the court erred when it did not dismiss this case based on a speedy trial violation. For his third claim, he maintains that our sentencing guidelines violate the Kansas Constitution's guaranty of the right to a jury trial. After reviewing the record, we hold the claimed

1

procedural errors are not reversible. In the matter of his third argument, we agree with the holding of another panel of this court and hold that our sentencing guidelines do not violate the Kansas Constitution. Thus, we affirm Hunter's convictions.

*Hunter's crimes begin after midnight one night in Lawrence.*

In March 2017, college student Dakota Burke and his girlfriend, Madalyn Kruep, lived in an apartment in Lawrence. Burke and Kruep sold marijuana to friends out of their apartment. They had another roommate, Ring Ringador, who worked at Whole Foods. He was out for the night, but some of his property was stolen that night. Shortly after midnight, Burke heard a gentle knock on the front door. When he looked through the peephole, he saw only darkness. Suspecting it was a friend playing a prank, Burke opened the door.

Suddenly two men rushed in demanding money and marijuana. They pointed guns at Burke's face and forced him to the floor. The men wore dark clothes, hats, and had their mouths covered. Burke could see "roughly mid cheek to their eyebrows." Their noses were showing. While one of the men held a gun on Burke, the other searched the apartment. Burke recognized the man pointing the gun at him based on his distinctive chubby cheeks and his voice, but he could not remember his name. The other man saw Kruep look out from inside the bedroom. He chased her down, grabbed her phone, and demanded money and marijuana from her. When Kruep did not produce any money or marijuana, the man hit Kruep on her head with his gun, put his hands around her neck, pushed her into the living room, and laid her down on the floor next to Burke. When Burke offered to help the men find money, one of the robbers whacked him on the head with his gun.

The men took the PlayStation 4 game controllers, two pairs of Beats headphones, Burke's phone, Kruep's wallet that contained about $800, and about $1,000 cash

2

belonging to Burke. They grabbed Burke's wallet, some money orders, clothing, and several jars containing marijuana. One of the jars was labeled "Hydro Lemo." Eventually, the men instructed Burke and Kruep to count to 100 before getting up, and the men left.

Burke realized that one of the robbers was someone who had been to his apartment a few times before with Burke's coworker from Texas Roadhouse—Shaun Roberson. Roberson's name came up several times in both trials. The robber had "chubbier cheeks, like it was very distinct." Burke "recognized [the man's] voice from the minute that he stepped in my house." Burke thought the man had "small dreads" coming out of his hat but was uncertain. Burke talked to friends who knew Roberson to try to figure out the name of the robber. About 30 minutes after the robbery occurred, Burke and Kruep called 911.

Burke and Kruep went to the police station for interviews. While they sat in an investigation room, Burke suddenly recalled that the robber's name was Norris. They searched for "Norris" and "Lawrence" on Facebook and found a profile for Norris Hunter. Kruep took a picture of the Facebook profile and texted the image to Detective David Garcia.

The police secured a search warrant for Norris' house. Norris lived with his mother, sister, and two brothers—Tyrone, and Tavaras. Next to a chair in the living room, officers found a PlayStation 4 with Ringador's username, Beats headphones, and a Whole Foods grocery bag containing game controllers. Behind the seat cushion, police discovered a jar of marijuana labeled "Hydro Lemo." Beneath the seat cushion, police found a pellet gun and an assortment of paperwork with Norris' name on it. Norris sometimes slept in that chair. Upstairs in what was believed to be Tavaras' bedroom, police found another set of Beats headphones, more glass jars containing marijuana, and a bandana.

Police found $911 in Norris' pocket. Norris' mother told detectives that Norris was home all night. But she was sleeping at the time of the robbery.

The State charged Norris with two counts of aggravated robbery, two counts of aggravated battery, aggravated burglary, and theft.

*The court denied two speedy trial dismissal motions.*

The trial date was first set for September 25, 2017. The trial was continued several times for various reasons. Discovery delays, the State filing a new charge against Norris stemming from a jailhouse phone call, and issues with unavailable State witnesses, all caused the trial court to finally set the trial for April 16, 2018.

Before trial, Norris moved to dismiss on speedy trial grounds, arguing that the continuance granted to the defense on September 18, 2017, should have been charged against the State because the State had failed to timely provide discovery to the defense. The trial court had charged that continuance against the defense. Norris specifically told the court he was not asserting prosecutorial misconduct over the discovery delay. Norris argued that the failure to reassess the continuance time against the State would impair his constitutional speedy trial right. The trial court denied the motion after finding that the State had not purposely delayed the discovery and that Norris was not prejudiced by the delay.

But later, another discovery issue surfaced during trial. Before trial, Norris had asked for Roberson's criminal history. At the September 18, 2017 status conference, the prosecutor objected to the request, believing that Roberson had never been interviewed by law enforcement and was not going to be a witness. The defense proceeded to trial on the theory that Tavaras and Roberson were the robbers. Defense counsel told the jury that despite Roberson's connection to the individuals involved, police elected not to interview

4

him. Early on the second day of trial, however, the prosecutor discovered that a detective had indeed talked to Roberson. The detective failed to put his report into the police department's file system. The trial court granted a mistrial noting, "I have reached my limit with regard to these late disclosures in discovery."

Norris again moved to dismiss the charges on speedy trial grounds, this time alleging misconduct relating to the late disclosure of Roberson's interview with the police and the subsequent mistrial. After a hearing, the court denied the motion, finding it was mere "oversight" by the detective in failing to timely file his report.

*At the second trial, Hunter suggests that his brother was guilty.*

At the second trial, the defense theory was that Tavaras was the robber that Burke had identified, and the second robber was someone else—likely Roberson. The defense argued that Norris and Tavaras had similar voices and builds.

Burke testified unequivocally that Norris robbed him. He was "absolutely" certain it was Norris. He recalled hanging out with Norris and Roberson at least three times, including once about a week before the robbery. He testified that he recognized Norris' voice because he "kind of like elongated his words, and I want to say like he had a black twang to his voice, but I don't know how to say that without sounding too terrible." The second man also had a "black twang" but it was "much deeper." Burke testified the second man was not Roberson. Roberson was much taller, not as stalky, had shorter hair, and Burke knew Roberson's voice. Kruep also knew Roberson and testified Roberson was not one of the robbers.

At one point, Burke told a detective that Roberson suspected Norris and Tavaras had committed the robbery together. When Roberson was hanging out with Norris and

Tavaras, Tavaras had talked about robbing Burke. Burke testified he did not know Tavaras.

There was other evidence linking Norris to the robbery. Hours before the robbery, Norris told Tyrone he was "about ready to do something that he shouldn't do." Norris also told his girlfriend that he planned to go do "something" on that night. He told her that he would no longer have money problems after. Norris' girlfriend told him to "think before u do anything tonight" and asked him to let her know when he was home safe. After the robbery, he messaged her that he was home, he would "never do this again," and "[t]here was no killing thank god." He told her he needed to get rid of a gun. He said that Tavaras had committed the robbery and he was just there. In messages to other people after the robbery, Norris revealed he had marijuana for sale.

Most of the fingerprints on the stolen items were not identifiable. But fingerprints from two jars of marijuana matched Tavaras'. Norris' DNA was found on the gun. Norris' police interview was played for the jury in which Norris denied involvement with the robbery. Norris wore his hair in braids when questioned by police shortly after the robbery.

Detective Lance Flachsbarth testified that police discounted Roberson as a suspect because Burke had been working with Roberson for a month and half and would have recognized his voice or other characteristics. Detective Charles Cottengim testified that he had contacted Roberson and set up an interview, but Roberson was a no-show. The detective went to Texas Roadhouse to track him down, but he had stopped working there. Roberson was never located.

The State offered a photo of Tavaras taken on March 21, 2017, and the court admitted it into evidence. The State offered the photo to show that Tavaras did not have chubby cheeks or braids.

6

Norris wanted to call Tavaras as a witness and ask him just four questions:

(1) his name;

(2) if he knew Norris;

(3) how he knew Norris; and

(4) whether he was Norris' older or younger brother.

The defense told the court its "only purpose" for calling Tavaras was for the jury to see him.

But then, the defense added that it wanted the jury to "hear his voice" when he answered the questions. Tavaras told the trial court that he would invoke his Fifth Amendment right against self-incrimination to any other questions, including questions about whether his appearance had changed since the robbery.

The State objected to Tavaras' limited testimony because he would "basically" be invoking his Fifth Amendment right on the stand after he answered the defense's four questions. This impaired the State's ability to cross-examine him, and Tavaras' appearance had changed significantly since the robbery. The State proffered that since March 2017, Tavaras had gained about 40 or 50 pounds, his face looked different, and his hair was braided.

The trial court excluded Tavaras' testimony, finding it would prejudice the State to not be able to cross-examine him. The court pointed out that the defense could have family members testify to the appearances of Tavaras and Norris around the time of the robbery. The court permitted the jury to observe Tavaras as he stood silent next to the witness stand for a short time.

7

The jury found Norris guilty of two counts of aggravated robbery and one count each of battery, aggravated burglary, and theft. Using a criminal history score of B, the court sentenced him to 228 months' imprisonment.

*We begin with Norris calling his brother to testify.*

Norris contends that evidence of the similarities between his voice and Tavaras' voice was essential to his defense. He argued that Tavaras was the robber and not himself. Because of this, he argues the trial court violated his right to present a complete defense. In his view, admitting this limited testimony was proper under *State v. Crumm*, 232 Kan. 254, 654 P.2d 417 (1982). He argues the trial court's concern about prejudicing the State was not an appropriate basis to exclude the testimony.

The State contends that allowing "Tavaras's limited, unchecked testimony would have frustrated the truth-seeking purpose of the trial. The district court protected the integrity of the adversarial process by excluding this testimony." The State complains it would not have been able to cross-examine Tavaras on issues such as his identity, his feelings about his brother, and any interest he might have in the outcome of the trial. The State would have had to leave Tavaras' credibility untested. The State also argues that Tavaras' testimony would not have changed the trial's outcome.

The admission of evidence involves several legal considerations. A court must determine its relevance and identify and apply any appropriate legal principles, including the rules of evidence. The court must weigh prejudice against probative value. See *State v. Shadden*, 290 Kan. 803, 817-18, 235 P.3d 436 (2010).

First, a court must determine whether the evidence is relevant. All relevant evidence is admissible unless it is prohibited by statute, constitutional provision, or court decision. See K.S.A. 60-407(f); *Nauheim v. City of Topeka*, 309 Kan. 145, 153, 432 P.3d

8

647 (2019). Even if evidence is relevant, a district court may exclude it when the court finds its probative value is outweighed by its potential for producing undue prejudice. K.S.A. 60-445.

In turn, an appellate court reviews any such determination for an abuse of discretion. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018). Whether a particular legal principle or statutory rule governs the admission of particular evidence is a question of law subject to de novo review. A principle or rule, however, is applied as a matter of law or as an exercise of the district court's discretion, depending on the applicable rule. See *State v. Miller*, 308 Kan. 1119, 1166, 427 P.3d 907 (2018).

The erroneous admission or exclusion of evidence is subject to review for harmless error under K.S.A. 2019 Supp. 60-261. *State v. Lowery*, 308 Kan. 1183, 1235, 427 P.3d 865 (2018). But if the error implicates a constitutional right, the effect of that error must be assessed under the constitutional harmless error standard: whether the party benefiting from the error proves beyond a reasonable doubt that the error would not or did not affect the outcome of the trial given the entire record. *State v. Williams*, 306 Kan. 175, 202-03, 392 P.3d 1267 (2017).

A proper proffer of the substance of the evidence sought to be admitted is required for an appellate court to be in a position to review a challenge to its exclusion. See K.S.A. 60-405; *State v. Garza*, 290 Kan. 1021, 1029, 236 P.3d 501 (2010).

*Rules that we must apply in this case*

A district court violates a criminal defendant's fundamental right to a fair trial if the court excluded relevant, admissible, and noncumulative evidence which is an integral part of the theory of the defense. But the right to present a defense is subject to statutory rules and judicial interpretation of the rules of evidence and procedure. *State v. Banks*,

9

306 Kan. 854, 865, 397 P.3d 1195 (2017). Whether an evidentiary ruling has violated the defendant's constitutional right to present a defense is subject to unlimited appellate review. See *State v. Seacat*, 303 Kan. 622, 638-39, 366 P.3d 208 (2016).

A defendant must be permitted to present a complete defense in a meaningful manner. But a defendant's right to call and examine witnesses is not absolute and can be overridden by other legitimate interests in the criminal trial process. The Fifth Amendment to the United States Constitution is one of those interests. *Crumm*, 232 Kan. at 259. The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Similarly, K.S.A. 60-425 provides that "every natural person has a privilege, which he or she may claim, to refuse to disclose in an action . . . any matter that will incriminate such person." This prohibition not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also privileges him not to answer questions put to him during the trial of another person where the answers might incriminate him in his own future criminal proceedings. *State v. Contreras*, 58 Kan. App. 2d 255, 268-69, 467 P.3d 522 (2020)(quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S. Ct. 316, 38 L. Ed. 2d 274 [1973]), *rev. granted* 312 Kan. ___ (August 27, 2020).

Claims of Fifth Amendment privilege should be determined outside the presence of the jury because undue weight may be given by a jury to a claim of privilege. It is improper for the prosecution or the defense knowingly to call a witness who will claim privilege, for the purpose of impressing upon the jury the fact of the claim of privilege. *Crumm*, 232 Kan. 254, Syl. ¶¶ 1-2. "'The jury may think it high courtroom drama of probative significance when a witness "takes the Fifth." [Citation omitted.]'" *Crumm*, 232 Kan. at 260. When the trial court is on notice that a witness will likely invoke his or her Fifth Amendment privilege against self-incrimination, the court should admonish the witness not to invoke that Fifth Amendment right in the presence of the jury. *State v.*

10

*Simpson*, 29 Kan. App. 2d 862, 874, 32 P.3d 1226 (2001). It is the prospect of this type of spectacle that concerns us here, and not prejudice to the State.

In *Crumm*, the State's theory was that the defendant killed his stepbrother at the direction of his mother. The defense asserted was insanity. By the defendant's trial, the defendant's mother had been arrested, questioned, and charged, but the charges had been dismissed. She was aware, however, that she could still be charged with the murder. The defendant sought to call his mother as a witness at his trial. The State asked the court to instruct defense counsel not to ask her about any matters which might cause her to invoke her Fifth Amendment privilege. The trial court granted the motion and no such questions were asked.

The defendant's mother testified on his behalf, but her testimony concerned only the defendant's early life, and did not address the events connected with the homicide. On appeal, the defendant contended that his counsel should have been permitted to question his mother about the homicide. But our Supreme Court disagreed. 232 Kan. at 260-61. Before his trial, the defendant's mother had informed the court that she would not answer any questions which might incriminate her—she would assert her Fifth Amendment privilege. Thus, any such questioning by counsel would have caused the witness to invoke her privilege in open court before the jury. The court held that it was improper for either party to knowingly call a witness who will claim privilege merely for the purpose of having that witness do so in the presence of the jury. The Supreme Court found no error in the trial court's ruling. 232 Kan. at 261.

Said another way, under the holding in *Crumm*, a defendant cannot call a witness just for the purpose of having the witness assert a Fifth Amendment privilege before the jury. But, unlike in *Crumm,* that is not what Norris wanted to do here. He wanted to call a witness only to answer four questions that the witness had agreed to answer. The *Crumm* court did not say it would prejudice the State if the State could not cross-examine the

11

witness on innocuous questions that the witness answered. The court in *Crumm* did hold it is within the discretion of the trial court to determine whether a witness, who the court knows intends to invoke his or her Fifth Amendment privilege, should be permitted to take the stand. 232 Kan. at 260-61.

A case we find persuasive on this point is *Lawson v. Murray*, 837 F.2d 653, 655-56 (4th Cir. 1988). It holds that the right of a defendant to present witnesses in his or her own defense "does not carry with it the right to immunize the witness from reasonable and appropriate cross-examination," reasoning that cross-examination is an indispensable tool in the search for truth. 837 F.3d at 655-56. Thus, the trial court does not abuse its discretion in striking testimony of a witness who invokes his or her privilege against self-incrimination on cross-examination. Thus, what the defense can present is not unlimited. But we are concerned about the prospect of Tavaras claiming his Fifth Amendment privilege in front of the jury.

There was a real risk of prejudice if Tavaras' testimony did not go as planned. Tavaras could have invoked the Fifth Amendment on the stand at any time, or tried to alter his voice to sound more like his brother. Thus, with this show in front of the jury, the inference could be drawn that he who claims the privilege is guilty—not the defendant. This is the very problem *Crumm* addressed. Thus, we do not view this ruling by the trial court as error.

There is one more point to be made. Norris argues that instead of cross-examining Tavaras, the State could have called Norris' family members to testify about the similarities (or lack thereof) of his and Tavaras' voices. But that argument works against Norris' constitutional claim. Norris was not denied the right to present his defense that Tavaras' voice was similar to his voice. He could have called his family members to testify to that effect. Thus, the trial court's error, if any, may not rise to a constitutional error.

12

Even if we assume that the trial court erred by excluding Tavaras' limited testimony, the error was harmless. We find beyond a reasonable doubt that the claimed error did not affect the outcome of the trial given the entire record.

The primary problem with Norris' defense—that he was not robber number one—is that it did not exonerate him. Norris blamed his brother, Tavaras. But there were two robbers. The State's theory was that Norris and Tavaras were the robbers. Their voices could have been similar. Burke testified both robbers had a "black twang." As Norris notes, that does raise a concern about cross-racial identification issues. But Burke relied on more than Norris' voice to identify him. Burke knew Norris. Norris had hung out at his apartment and played video games two or three times before. Norris' face was not completely covered; only his mouth and above his eyes were covered. Burke recognized Norris' "chubbier cheeks." Burke could see the robbers' builds. Burke thought he saw Norris' dreads. He was unequivocal in his testimony that Norris was one of the robbers. Burke was also confident Roberson was not one of the robbers.

The police immediately searched Norris' home and found some of the stolen items in the area where Norris slept. Norris was carrying over $900 in cash. Hours before the robbery, Norris told Tyrone and his girlfriend he planned to do something that he should not do. In text messages, Norris told his girlfriend that he would not have money problems after he did "something". Norris' girlfriend tried to talk him out of it and asked him to let her know when he was home safe. After the robbery was over, Norris messaged her that he was home, he would "never do this again," and "[t]here was no killing thank god." He told her he needed to get rid of a gun. He told her that Tavaras had committed the robbery and he was there. In messages to other people after the robbery, Norris revealed he had marijuana for sale.

Norris asks us to overturn his conviction on the possibility that Tavaras' voice was so much like Norris' voice, the jury would have found Burke mistakenly identified a

13

partially masked Tavaras as Norris. Tavaras' voice is not in the record so we cannot independently review the similarity, if any. Even so, there was significant evidence linking Norris to the robbery other than the possible similarities in Norris' and Tavares' voices. We find no error here.

*We turn to the speedy trial issue.*

Norris focuses on the continuance granted on September 18, 2017, moving the trial date from September 25 to October 30, 2017. He contends prosecutorial misconduct caused that delay. In his view, the prosecutor acted with gross disregard for his rights when she failed to disclose the "phone dump" from Norris' cell phone promptly.

The record reflects that:
- The raw data from Norris' phone search was placed into evidence on August 3;
- a summary of some of the materials from the phone pull was provided to the defense on August 16;
- the defense asked for the raw data on August 24;
- but the raw data was not disclosed to the defense until September 18, 2017.

Norris also argues that the prosecutor's failure to disclose the law enforcement contact with Roberson at the status conference on September 18, 2017, constituted misconduct. He argues reversal of his conviction is warranted under K.S.A. 2017 Supp. 22-3402(g) because of the misconduct.

In the alternative, he argues reversal is warranted because the delay amounted to a constitutional speedy trial violation. He contends the State's untimely discovery impaired his defense. He proceeded into the first trial believing that the police had not contacted

14

Roberson and he was forced to request a mistrial. And in doing so, he previewed his defense to the State before the second trial.

*The rules we must follow on this issue are well established.*

A defendant's statutory speedy trial right must be considered in ruling on a motion for continuance. The State has an obligation to ensure the defendant is provided a speedy trial within statutory limits. But delays which result from the defendant's application or fault are not counted in computing the statutory period, including delays from a continuance granted at the defendant's request. *State v. Robinson*, 306 Kan. 1012, 1018-19, 399 P.3d 194 (2017).

Under K.S.A. 2017 Supp. 22-3402(a), a person charged with a crime and held in jail for that crime must be brought to trial within 150 days after that person's arraignment or discharged from further liability for the crime, unless the delay was the result of the application or fault of the defendant, or a continuance was ordered by the court under subsection (e).

If the defendant requests a continuance and one is granted, the delay "shall be charged to the defendant regardless of the reasons for making the request, unless there is prosecutorial misconduct related to such delay." K.S.A. 2017 Supp. 22-3402(g). If a delay is at first attributed to the defendant, as here, but is later charged to the State for any reason, such delay "shall not be used as a ground for . . . reversing a conviction unless not considering such delay would result in a violation of the constitutional right to a speedy trial or there is prosecutorial misconduct related to such delay." K.S.A. 2017 Supp. 22-3402(g). Norris asserts both prosecutorial misconduct and a violation of his constitutional speedy trial right.

15

Citing the United States Supreme Court, our Supreme Court has identified four nonexclusive factors to be analyzed when a criminal defendant makes a Sixth Amendment speedy trial claim. Those factors are:

- the length of delay;

- the reason for the delay;

- the defendant's assertion of his right; and

- prejudice to the defendant.

*State v. Owens*, 310 Kan. 865, 869, 451 P.3d 467 (2019) (quoting *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 [1972]).

Kansas courts employ a balancing test that requires weighing the conduct of both the prosecution and the accused. None of the factors is a necessary or sufficient condition for finding a violation. Instead, we consider them together along with any other relevant circumstances. *Owens*, 310 Kan. at 869.

A trial court's factual findings on a defendant's speedy trial right are reviewed for substantial competent evidence, but the ultimate legal conclusion drawn from those facts is reviewed de novo. 310 Kan. at 868. Interpretation of the defendant's statutory speedy trial right is a question of law reviewed de novo. *State v. Williams*, 311 Kan. 88, 92, 456 P.3d 540 (2020).

*The claim of misconduct is not supported in the record.*

We note that the trial court found no misconduct by the State. The court found the prosecutor had not "intentionally" delayed the phone dump discovery. And the court found that Detective Cottengim's failure to file the Roberson report was an oversight. In other words, negligence. That does not rise to the level of misconduct.

16

"'Prosecutorial acts properly categorized as "prosecutorial misconduct" are erroneous acts done with a level of culpability that exceeds mere negligence.'" *State v. Chandler*, 307 Kan. 657, 695, 414 P.3d 713 (2018). The record here does not show that the prosecutor acted with a culpability exceeding mere negligence.

Norris tries to avoid that problem by now arguing the prosecutor committed a *Brady* violation. We are not so persuaded. First, the phone dump discovery was not exculpatory or impeaching. Under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), prosecutors have an affirmative duty to disclose evidence favorable to the accused when the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecutor. Because law enforcement's knowledge of evidence is imputed to the State, a *Brady* violation can occur when the prosecutor withholds material evidence that is not known to the prosecutor, but is known to law enforcement.

There are three essential elements of a *Brady* violation:
  (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;
  (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and
  (3) the evidence must be material so that it establishes prejudice.
*State v. Hirsh*, 310 Kan. 321, 334, 446 P.3d 472 (2019).

Norris admits the phone dump lacked exculpatory or impeaching evidence. And the continuance granted on September 18, 2017, was not granted because of the Roberson information. The Roberson issue surfaced later.

Second, delayed rather than absent disclosure of exculpatory information may not qualify as a *Brady* violation if the defendant cannot establish prejudice because of his or

17

her inability to use the *Brady* material effectively at trial. *Hirsh*, 310 Kan. at 336. Norris fails to establish prejudice relating to the delayed discovery.

And finally on this point, a *Brady* violation is not per se prosecutorial misconduct. *State v. Henderson*, No. 120,213, 2020 WL 1658859, at *8 (Kan. App. 2020) (unpublished opinion), *rev. denied* 312 Kan. ___ (September 30, 2020).

*Norris' constitutional speedy trial right was not violated*.

The trial court did not analyze each of these factors—it simply found there was no prejudice to the defense. We will take a closer look at the four factors.

*1. Length of delay*

Courts consider whether the length of the delay is presumptively prejudicial in relation to the complexity of the case given the type of crime charged and the nature of the evidence involved. A long delay for an ordinary street crime charge will be less tolerated than a delay for a serious, complex conspiracy charge. In *Owens*, the court found a 19-month delay between Owens' arrest and trial presumptively prejudicial in a simple and straightforward aggravated robbery case given the nature of the evidence involved. 310 Kan. at 875.

Norris was charged with aggravated robbery, battery, aggravated burglary, and theft. He was charged on March 8, 2017. His first jury trial began on April 16, 2018. This was about a 13-month delay.

At one of the hearings, the trial court noted that it appointed Norris two attorneys because there was a "massive amount of discovery." The trial took a week. Still, it was not a complicated case. Norris was identified hours after the robbery. The evidence

18

mainly consisted of two eyewitnesses' testimony, statements from Norris' mother and brother, a series of stolen items found during the search of the Hunters' home, and text messages found on Norris' phone. The delay was not overly prejudicial, but we will carry on with the analysis.

*2. Reason for delay*

A deliberate attempt to delay the trial to hamper the defense weighs heavily against the government. A more neutral reason such as negligence weighs less heavily, but it still should be considered since the ultimate responsibility to bring the defendant to trial in a timely manner rests with the State. A reason such as a missing witness justifies appropriate delay. When the defendant's actions were the primary cause of the delay, the second factor weighs heavily against the defendant. *Owens*, 310 Kan. at 875-76.

The State requested one continuance because of unavailable witnesses—a justified delay. Norris requested two continuances because of the belated phone dump discovery and the impending new charges. Those delays do not weigh heavily either way.

*3. Assertion of right*

When Norris asked for his first continuance, he did argue for the time to be charged against the State. Norris did move to dismiss on speedy trial grounds twice. But Norris also asked for a second continuance knowing that he was waiving his speedy trial right by doing so. Again, this factor does not weigh heavily for either side.

*4. Prejudice*

The speedy trial right was designed to protect three interests:
- to prevent oppressive pretrial incarceration;

19

- to minimize anxiety and concern of the accused; and

- to limit possible impairment of the defense.

*Owens*, 310 Kan. at 880.

Norris was incarcerated while awaiting trial. But there is no indication in the record that the defense was impaired because of the delay. Neither the phone dump discovery, the police's contact with Roberson, nor the new charges appear to have changed Norris' defense strategy. There is no indication that witnesses were unable to testify due to the delay.

The prosecutor's representation to the defense that there had been no police contact with Roberson could be considered prejudicial. In *State v. Grey*, 46 Kan. App. 2d 988, 1002, 268 P.3d 1218 (2012), this court held a prosecutor's false representation to the defense caused a great prejudice to the defense:

> "[W]hen the State has maintained to the court and defense counsel that it does not have certain evidence, fundamental fairness calls for the State to inform the court and counsel that it now has such evidence. This is especially true when the defense has been structured on the State's representation that such evidence does not exist. Under the circumstances in this case, failure to disclose the change amounted to a deception that created a great prejudice to the defense."

Here, like in *Grey*, the prosecutor represented to the defense that law enforcement had no contact with Roberson, which was not true. But the prosecutor did not know it was untrue. And unlike in *Grey*, as soon as the prosecutor discovered Detective Cottengim had contact with Roberson, she disclosed that to the defense.

But any issue with the late Roberson discovery was cured by the mistrial. Norris cannot complain about a speedy trial violation in relation to the mistrial because a

mistrial resets the speedy trial clock. See K.S.A. 2017 Supp. 22-3402(f); *Williams*, 311 Kan. at 92-93.

The relevant factors do not support finding a constitutional speedy trial violation.

*Our sentencing guidelines do not violate the Kansas Constitution.*

Norris contends that the sentencing court's use of his prior convictions to elevate his sentence without the convictions having been found by a jury violated his right to a jury trial under section 5 of the Kansas Constitution Bill of Rights and the Sixth Amendment to the United States Constitution as interpreted by *Apprendi v. New Jersey*, 530 U.S. 466, 477, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). He argues that when the Kansas Constitution was enacted, criminal defendants had a common-law right to a jury trial on penalty-enhancing prior conviction findings, and that section 5 preserved that right. He acknowledges he did not raise these issues below but argues he can raise them for the first time on appeal because they are pure questions of law and necessary to preserve his fundamental right.

Norris admits that our Supreme Court has repeatedly rejected his challenge with respect to the United States Constitution. See *State v. Sullivan*, 307 Kan. 697, 708, 414 P.3d 737 (2018) (reaffirming *State v. Ivory*, 273 Kan. 44, 46-47, 41 P.3d 781 [2002]). We are duty-bound to follow this precedent. See *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). We will not rule otherwise now.

A panel of this court recently considered and rejected Norris' challenge with respect to the Kansas Constitution in *State v. Albano*, 58 Kan. App. 2d 117, 464 P.3d 332 (2020), *rev. granted* 312 Kan. ___ (September 30, 2020). Section 5 of the Kansas Constitution Bill of Rights states: "The right of trial by jury shall be inviolate." The *Albano* panel held that section 5 provides protection like, not greater than, the federal jury

21

trial right. 58 Kan. App. 2d at 129. The panel also held that there was no universal common-law right to have a jury find prior convictions, and Kansas' position has always been that a defendant does not have a right to have a jury determine prior convictions for sentencing purposes. 58 Kan. App. 2d at 134.

The *Albano* panel's reasoning is sound, and we hold similarly. Our guidelines do not violate the Kansas Constitution.

Affirmed.